1
2
3
4
5
6

Michael Rubin (SBN 80618)
Connie K. Chan (SBN 284230)
Raphael N. Rajendra (SBN 255096)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
mrubin@altber.com
cchan@altber.com
rrajendra@altber.com

7
8
9
10
11
12

Cliff Palefsky (SBN 77683)
Keith Ehrman (SBN 106985)
MCGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202
CP@mhpsf.com
keith@mhpsf.com

13    *Attorneys for Plaintiffs and the Proposed Class*

14

15            **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

17

18  PETER SCHUMAN, an individual, and            Case No.
    WILLIAM COPLIN, an individual, on behalf
19  of themselves and on behalf of others         CLASS ACTION
    similarly situated,
20                                                 **CLASS ACTION COMPLAINT**
                        Plaintiffs,
21
            v.
22
    MICROCHIP TECHNOLOGY
23  INCORPORATED, a corporation; ATMEL
    CORPORATION, a corporation; and ATMEL
24  CORPORATION U.S. SEVERANCE
    GUARANTEE BENEFIT PROGRAM, an
25  employee benefit plan,

26                      Defendants

27

28

**<u>INTRODUCTION</u>**

1.      This is an ERISA breach of fiduciary duty case, brought as a class action by former employees of defendant Atmel Corporation ("Atmel") and of the company that acquired Atmel by merger, defendant Microchip Technology, Inc. ("Microchip").

2.      In July 2015, when Atmel decided to seek potential merger partners, it created an ERISA severance plan, the "U.S. Severance Guarantee Program" (the "Severance Guarantee Plan" or the "Plan") to induce its employees to remain in their jobs while Atmel searched for a merger partner.  That Severance Guarantee Plan promised plaintiffs and class members that, if they were terminated without cause following a change of control of the company, they would receive several months of additional salary, health insurance premium payments, and a pro-rated incentive bonus payment as severance benefits under the Plan (provided that the employee's termination occurred within 18 months after an Initial Triggering Event).  The Plan went into effect on July 9, 2015.  The Initial Triggering Event occurred on September 19, 2015, when Atmel signed its initial merger agreement.

3.      From September 19, 2015 until after the merger between Atmel and Microchip had become final on April 4, 2016, Atmel (and then Microchip) repeatedly reassured plaintiffs and class members that the Plan was in effect, and that every employee terminated without cause after a merger would receive the severance payments guaranteed by the Plan (at least with respect to employees terminated before March 19, 2017, which was the end of the 18-month period which had commenced with the Initial Triggering Event).  Once the merger became final on April 4, 2016 and Microchip began massive layoffs of former Atmel employees, defendants took the exact opposite position, in violation of their fiduciary duties and severance plan obligations under ERISA. Defendants falsely and fraudulently informed plaintiffs and class members that the Plan had ceased to exist; that the Plan's benefits were no longer available; and that the only way a terminated employee could become eligible for even a considerably less attractive package of severance benefits would be for that employee to execute a broad release waiving any and all claims against defendants, including a claim for the full amount of benefits guaranteed by the Plan.

4.      By this class action lawsuit, plaintiffs and class members as described herein (all

individuals employed by Atmel as of April 4, 2016, who were terminated or might be terminated without cause by Microchip before the March 19, 2017 expiration date of the Plan) seek: a) a declaration that the Plan is valid and enforceable and remains in existence, that any releases obtained by defendants as a result of their misrepresentations and other wrongful conduct are void and unenforceable, and that all Plan participants, including plaintiffs and class members, are entitled to receive the full amount of benefits provided by the Plan if they have been, or are, terminated without cause at any time between the Merger close date and March 19, 2017; b) an injunction against defendants' enforcement of any such releases, prohibiting defendants from continuing to deny Plan benefits to eligible employees, prohibiting defendants from continuing to make false and fraudulent statements about the Plan's existence or about any employee's current or future right to benefits under the Plan, prohibiting defendants from soliciting releases from plaintiffs and class members who have not already signed releases pursuant to defendants' unlawful scheme, prohibiting defendants from continuing to delay the processing of any plaintiff's or class member's claim for ERISA benefits, and requiring defendants to pay the full amounts and benefits promised under the Plan to all employees who were or will be terminated without cause between the Merger close date and March 19, 2017; and c) equitable make-whole relief to all employees who received less in severance benefits upon their termination by Microchip or Atmel than the Plan guaranteed.

## JURISDICTION AND VENUE

5.      This is an action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§1001 *et seq.* ("ERISA"), seeking equitable relief under Sections 502(a)(1)(B) and (a)(3) of ERISA, 29 U.S.C. §§1132(a)(1)(B) and (a)(3). This Court has original federal question jurisdiction pursuant to 28 U.S.C. §1331 and ERISA.

6.      The Northern District of California has personal jurisdiction over all defendants, because defendants Atmel and Microchip did business and are continuing to do business in this district, because defendant Plan was created in this district, and because most of the acts complained of herein occurred in this district and gave rise to the claims alleged.

7.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. §1391(b) and (c) because defendants may be found in this district and because a substantial number of the

1   events alleged occurred in this district.

2   **PARTIES**

3   8.   Plaintiff Peter Schuman is an individual and a former employee of defendants Atmel

4   and Microchip and a resident of San Mateo County, California.  Schuman is a participant in

5   defendant Atmel Corporation's U.S. Severance Guarantee Benefit Program, as defined under Section

6   2(7) of ERISA, 29 U.S.C. §1002(7).  Defendants Atmel and Microchip terminated plaintiff Schuman

7   without cause on or about April 6, 2016 and falsely informed him that he was not entitled to any

8   benefits under the Plan upon such termination.

9   9.   Plaintiff William Coplin is an individual and a former employee of defendants Atmel

10  and Microchip and a resident of Santa Clara County, California.  Coplin is a participant in defendant

11  Atmel Corporation U.S. Severance Guarantee Benefit Program, as defined under Section 2(7) of

12  ERISA, 29 U.S.C. §1002(7).  Defendants Atmel and Microchip terminated plaintiff Coplin without

13  cause on or about June 10, 2016, and falsely informed him that he was not entitled to any benefits

14  under the Plan upon such termination.

15  10.   Defendant Atmel Corporation U.S. Severance Guarantee Benefit Program is an

16  employee benefit plan within the meaning of Section 2(3) of ERISA, 29 U.S.C. §1002(3).

17  11.   At all relevant times, defendant Atmel Corporation was a corporation incorporated in

18  the State of Delaware, with its principal place of business in San Jose, California.

19  12.   At all relevant times, defendant Microchip Technology Incorporated is a corporation

20  incorporated in the State of Delaware, with its principal place of business in the State of Arizona.

21  On information and belief, Microchip is the Plan Administrator, or controls the Plan Administrator,

22  for the Severance Guarantee Plan; has the authority to resolve any and all benefit claims under the

23  Severance Guarantee Plan; and has responsibility to pay benefits due under the Severance Guarantee

24  Plan.

25  **GENERAL FACTS AND ALLEGATIONS**

26  ***The Severance Guarantee Plan***

27  13.   Until April 2016, when Atmel became a wholly owned subsidiary of Microchip,

28  Atmel was a publicly traded corporation.  Atmel is a supplier of general purpose microcontrollers,

Class Action Complaint

which are self-contained computers on a single chip used in a variety of industrial and consumer products, including devices that connect to, and communicate through, the internet.

14.     In July 2015, in response to "significant market speculation regarding possible transactions involving the company," and "[t]o support our employees and to keep everyone focused on our continued success," Atmel announced the creation of a "U.S. Severance Guarantee Program," applicable to all of its approximately 1,800 employees based in the United States.  Atmel informed its U.S. employees that it was seeking a merger partner, and that it was rolling out the Severance Guarantee Plan to encourage all employees to continue working for Atmel and any successor entity notwithstanding the uncertainty surrounding Atmel's corporate future.  Between July 2015 and at least April 4, 2016 when the merger between Atmel and Microchip closed, Atmel was the Plan Administrator of the Severance Guarantee Plan.

15.     On or about July 9, 2015, Atmel delivered personalized letters to each of its U.S.-based employees, including plaintiffs and class members herein, describing the benefits to which they would be entitled under the Severance Guarantee Plan if their employment were terminated without cause within 18 months after Atmel agreed to merge into, or be acquired by, another company (the "July 9 Severance Guarantee Letter").  Attached to each July 9 Severance Guarantee Letter was an addendum ("July Addendum") that set forth additional terms and details of the Severance Guarantee Plan.  All U.S.-based Atmel employees, including plaintiffs and class members herein, were sent the identical July Addendum.  The July 9 Severance Guarantee Letters that Atmel distributed to all of its U.S.-based employees were identical, except for the specific benefit level described for each class of employee.

16.     The July 9 Severance Guarantee Letter and the July Addendum (together, the "Plan Documents") identified three benefits guaranteed by the U.S. Severance Guarantee Program: a) a cash payment of between 25% and 50% of the employee's annual base salary (depending on whether the employee was a director, a professional exempt employee, or a non-exempt employee); b) paid health insurance premiums for between three and six months (again depending on the employee's job category); and c) for director-level and professional exempt employees, a prorated portion of the employee's annual incentive bonus.

17.     Atmel provided the Plan Documents to all of its U.S.-based employees on or about July 9, 2015.  Atmel subsequently provided the Plan Documents to all U.S.-based employees who were hired after July 9, 2015 but before April 4, 2016—the date of Atmel's eventual merger with Microchip.  All of Atmel's U.S.-based employees, including plaintiffs and class members herein, were covered by the Severance Guarantee Plan at the time of Atmel's April 4, 2016 merger with Microchip.

18.     The Plan Documents state that if an "Initial Triggering Event" occurred—defined as Atmel "enter[ing] into a definitive agreement (a 'Definitive Agreement'), on or before November 1, 2015, that will result in a Change of Control of the Company"—the Severance Guarantee Plan would "remain in effect for 18 (eighteen) months following that Initial Triggering Event."  The Plan Documents further state that during that 18-month time period, the Severance Guarantee Plan would be "available to eligible employees," that all "U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated" would be eligible for the Plan, and that each eligible employee would become entitled to the Plan's benefits upon being terminated without cause within 18 months of the date Atmel had entered into a Definitive Agreement.

19.     When Atmel created the Plan, it recognized that it might enter into an initial Definitive Agreement with Company A (an "Initial Triggering Event"), but later decide to accept a more attractive merger or acquisition proposal made before the closing date by Company B—a common occurrence in corporate mergers.  Atmel drafted the Plan with the intent and for the purpose of guaranteeing that its employees would remain entitled to benefits guaranteed by the Severance Guarantee Plan if those employees were terminated without cause within 18 months after an Initial Triggering Event, even if Atmel eventually merged with a different company during the time the Plan was in effect than the company with which it initially planned to merge.

20.     The Plan Documents do not state, imply, or in any way require that the Initial Triggering Event and the Change of Control must involve the same acquiring company.  To the contrary, the language of the Plan, and the consistent expressed intent of defendants throughout the relevant time period, was that the Definitive Agreement giving rise to the Initial Triggering Event did not have to be with the same company with which a Change of Control eventually occurred.  The

1   purpose of the Plan was to create financial incentives to encourage Atmel's employees to remain

2   Atmel employees during the pre- and post-merger period, regardless of which merger partner Atmel

3   eventually selected.

4   **_Atmel's Merger & Acquisition Activity, and Microchip's Assurances to Atmel's Employees_**

5   21.    The Plan Documents state that a Definitive Agreement must be entered into before

6   November 1, 2015 to constitute the "Initial Triggering Event" that would extend the Plan for 18

7   months.  If no Definitive Agreement were entered into before November 1, 2015, the Plan would

8   expire by its terms and Atmel employees would not be entitled to any of the Plan benefits.

9   22.    On September 19, 2015, Atmel executed a "Definitive Agreement" within the

10  meaning of the Plan with Dialog Semiconductor plc ("Dialog"), under which Dialog agreed to

11  acquire Atmel for $4.6 billion in cash and stock.  Atmel and Dialog entered into a formal

12  "Agreement and Plan of Merger" ("Merger Agreement") on that date and announced that Merger

13  Agreement publicly in press releases.  In September 2015 Atmel and Dialog identified the Merger

14  Agreement in a Form 8-K filing and a Form 425 filing with the Securities and Exchange

15  Commission ("SEC").

16  23.    The September 19, 2015 Atmel-Dialog Merger Agreement constituted a "definitive

17  agreement that will result in a change of control of Atmel" within the meaning of the Severance

18  Guarantee Plan.  Because this "Definitive Agreement" was executed before November 1, 2015, it

19  constituted an "Initial Triggering Event" that automatically extended the Severance Guarantee Plan

20  for 18 months from the execution date of the Definitive Agreement.  Therefore, if Atmel

21  experienced a subsequent Change of Control and if Atmel employees were terminated without cause

22  before March 19, 2017, those terminated employees would become entitled to the Plan's benefits

23  pursuant to the express language of the Severance Guarantee Plan.

24  24.    Before Atmel executed its merger agreement with Dialog, it had also been engaged in

25  merger discussions with defendant Microchip.  Microchip continued to express interest in merging

26  with, or acquiring, Atmel; and before the scheduled January 2016 closing date of the proposed

27  Atmel/Dialog merger, Microchip made an offer to acquire Atmel that Atmel's Board of Directors

28  concluded was better than Dialog's offer.  In mid-January 2016, Atmel gave Dialog the opportunity

1   to respond to Microchip's offer by improving the terms of its own offer to acquire Atmel.

2       25.     Atmel's employees became aware in or about mid-January 2016 that Microchip was

3   attempting to acquire Atmel and that Microchip might replace Dialog as Atmel's merger partner.

4   Atmel's management was aware of the uncertainty this created, even though Atmel, as the creator

5   and Plan Administrator of the Severance Guarantee Plan, knew and understood that, because the

6   Initial Triggering Event had already occurred in September 2015, Atmel's employees would

7   continue to be entitled to the benefits guaranteed by the Severance Guarantee Plan if they were

8   terminated without cause before March 19, 2017, regardless of which entity eventually acquired

9   Atmel.

10      26.     To alleviate employee concerns and to further the purposes underlying Atmel's

11  creation of the Plan, Atmel management repeatedly assured its employees in January 2016 and

12  thereafter that, even if Microchip replaced Dialog as the acquiring company, any employees

13  terminated without cause after that acquisition and prior to March 19, 2017 would still be entitled to

14  receive the severance benefits provided by the Severance Guarantee Plan, just as if Dialog were the

15  acquiring company.

16      27.     On or about January 13, 2016, Atmel's Chief Executive Officer held a meeting with

17  Atmel employees who were employed at the Director level or above.  Plaintiffs Peter Schuman and

18  William Coplin attended this meeting.  After Atmel's CEO explained that Microchip had made a

19  better offer than Dialog's and that Atmel planned to give Dialog four days in which to make a

20  counter-offer, Atmel's CEO reiterated to those employees that all of the severance benefits

21  guaranteed by the Plan would remain available pursuant to the Plan, regardless of whether the

22  ultimate purchaser was Microchip or Dialog.

23      28.     On or about January 14, 2016, Atmel's Senior Vice President of Global Human

24  Resources sent a letter to numerous Atmel employees, noting widespread speculation among

25  employees about the potential acquisition of Atmel, confirming that the Severance Guarantee Plan

26  remained in effect, and emphasizing that employees' eligibility for severance benefits under that

27  Plan would not be affected by the fact that Microchip might be replacing Dialog as the acquiring

28  company.  Atmel's January 14, 2016 letter expressly stated that the "U.S. Severance Guarantee

Program continues to remain in place" and would entitle employees to severance benefits "in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip."  Between January and April 2016, many other members of Atmel management similarly encouraged Atmel's employees to remain employed at Atmel and not look for jobs elsewhere, by assuring them that those employees were fully covered by the severance benefit guarantees provided by the Plan.

29.     Dialog did not make a new offer to acquire Atmel during the January 14-18, 2016 window.  Because Microchip's offer was determined by Atmel's Board of Directors to be "superior" to Dialog's offer, Atmel was entitled under the terms of its Merger Agreement with Dialog to withdraw from that merger and to accept Microchip's acquisition offer instead.  Atmel thereupon withdrew from its agreement with Dialog and entered into a merger agreement with Microchip on or about January 19, 2016 ("the Microchip Merger Agreement").  Atmel's merger with Microchip ("the Merger") was originally scheduled to close in the spring of 2016 and did in fact close on April 4, 2016.

30.     During the winter of 2015-16 and the spring of 2016, before the Merger between Atmel and Microchip closed, Atmel provided Microchip with all material documents relating to the Severance Guarantee Plan in effect with its employees, including the Plan Documents and the September 2015 Merger Agreement between Dialog and Atmel.  Atmel also provided Microchip with summaries and estimates of how much in severance pay and benefits would be owed to Atmel employees under the Severance Guarantee Plan if Microchip acquired Atmel and then terminated Atmel's covered employees without cause before March 19, 2017.  Atmel understood and believed throughout this period and thereafter that the Initial Triggering Event under the Severance Guarantee Plan had occurred in September 2015; that the Plan had thereby been extended until March 2017 and remained in effect with Microchip as its acquiring company; and that if Microchip acquired Atmel and terminated Atmel employees without cause prior to March 2017, Microchip would be obligated to pay the benefits under the Plan to the terminated employees.

31.     Between mid-January and early April 2016, Atmel repeatedly communicated to Microchip its understanding and belief, as the drafter and Plan Administrator of the Severance

Guarantee Plan, that the Plan was in effect until mid-March 2017 and that Microchip would be obligated to pay the severance benefits provided by that Plan to all Atmel employees, including plaintiffs and class members herein, who were terminated without cause before March 19, 2017. Microchip was fully aware of the Severance Guarantee Plan at the time the Merger closed; was fully aware that the Initial Triggering Event had occurred in September 2015; was fully aware that Atmel believed and intended (as the creator of the Plan and the Plan Administrator) that the Plan remained in effect notwithstanding that Microchip had replaced Dialog as Atmel's acquiring company; and was fully aware that Microchip would be obligated to pay all benefits guaranteed by the Plan if it subsequently terminated Atmel employees without cause while the Plan remained in effect. Microchip was also fully aware that Atmel management was communicating these beliefs and understandings to Atmel employees, and that Atmel was assuring its employees, including plaintiffs and class members herein, that they were entitled to receive, and would receive, the severance benefits guaranteed by the Plan if they were terminated without cause before March 19, 2017.

32.     Between mid-January and early April 2016, Microchip repeatedly, affirmatively and deliberately led Atmel management and Atmel employees to believe that Microchip, as the post-merger Plan Administrator, recognized the continued existence of the Severance Guarantee Plan, intended to honor the Severance Guarantee Plan, and would pay all severance benefits provided by the Plan to all Atmel employees terminated without cause before mid-March 2017.

33.     On or about February 3, 2016, Atmel management distributed to its employees a Frequently Asked Questions ("FAQ") memorandum regarding the Microchip transaction.  This memorandum, which was made available online for all Atmel employees, was entitled "Microchip Transaction: Effect on Compensation and Benefits for U.S. Employees."  The FAQ began with the question, "What happens to my employment and compensatory arrangements with Atmel after the closing?"  The FAQ that answers that question stated: "Microchip has agreed to honor each of your employment and compensatory contracts (including … severance … agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction."  Microchip senior management specifically reviewed and approved this FAQ before Atmel distributed it to Atmel's employees, including plaintiffs and class members, on or about February 3, 2016.  Microchip knew

and understood that Atmel employees reading this FAQ would understand and believe that Microchip was aware of the Severance Guarantee Plan; that Microchip understood that the Severance Guarantee Plan continued to exist; and that Microchip had agreed to pay the severance benefits set forth in the Plan to those Atmel employees who were terminated following Microchip's acquisition of Atmel, in accordance with the Plan.

34.     The Proxy Statement that Microchip and Atmel filed with the SEC in February 2016, which referred to and incorporated the Microchip Merger Agreement between Microchip and Atmel, stated: "Microchip has agreed, as of the Effective Time, to honor and perform all employment compensatory contracts between Atmel . . . and any Atmel employees . . . (including all . . . employment compensation, severance . . . change in control and termination contracts disclosed to Microchip . . ."  Microchip assisted with drafting that Proxy Statement before its filing with the SEC and independently reviewed and approved the Proxy Statement's contents.  Microchip knew and understood that the Proxy Statement would reinforce Atmel employees' understanding and belief that Microchip would honor the Severance Guarantee Plan and would pay the severance benefits set forth in the Plan to those Atmel employees who were terminated following Microchip's acquisition of Atmel in accordance with the terms of the Plan.

35.     On February 29, 2016, three senior members of Microchip's finance team visited Atmel's corporate headquarters in San Jose, California to discuss the upcoming acquisition/merger between Microchip and Atmel: Microchip's Chief Financial Officer (Eric Bjornholt), its Director of Finance (Phil Kagel), and its Vice President of European Finance (Nawaz Sharif).  On the morning of February 29, 2016, these three Microchip executives met with the senior members of Atmel's Finance team (Director-level and above), comprising approximately 12 to 15 Atmel employees.  Plaintiff Peter Schuman was one of the Atmel employees who attended this meeting.  During this meeting, which included a question-and-answer session regarding the upcoming Atmel-Microchip merger, one of the Atmel employees asked the Microchip executives for confirmation that Microchip would honor the Plan.  In response, Microchip's CFO (Mr. Bjornholt) assured the Atmel employees that, if Microchip acquired Atmel and then terminated Atmel employees, Microchip would honor the Plan.  Later that same morning, Messrs. Bjornholt, Sharif, and Kagel held a second meeting with a

larger group of Atmel finance employees at Atmel's San Jose headquarters.  This meeting was attended by all (or almost all) of Atmel's San Jose finance team, including plaintiff Schuman. Approximately 50 to 60 Atmel employees attended that meeting.  During that second meeting, which again focused on the upcoming merger between Atmel and Microchip, Mr. Bjornholt again reiterated to the Atmel employees that Microchip would honor the Plan if Microchip later terminated any Atmel employees.  Microchip's Chief Financial Officer made these statements and representations with the knowledge and intent that Atmel employees would rely upon those statements and representations and would conduct themselves with the understanding and belief that Microchip would honor the Plan and would provide the severance benefits guaranteed by the Plan to any former Atmel employee terminated without cause prior to March 19, 2017, as the Plan requires.

36.     Between mid-January and early April 2016, Atmel management repeatedly, consistently, and expressly communicated to its employees that the Severance Guarantee Plan was in effect and that any Atmel employees terminated without cause following the acquisition by Microchip would receive the severance benefits provided by the Severance Guarantee Plan.  Atmel management also communicated to Atmel employees on many occasions that: a) Microchip was aware of the Severance Guarantee Plan: b) Microchip was aware of its obligation to pay severance benefits under the Severance Guarantee Plan if Microchip acquired Atmel and then terminated Atmel employees without cause during the covered period; and c) Microchip had agreed to honor the severance obligations under the Plan.  Microchip knew at the time of the closing of the merger and thereafter that Atmel had repeatedly told its employees that the Severance Guarantee Plan was in effect, that those employees would be paid the severance benefits under the Plan if they were terminated following the merger, and that Microchip had agreed to honor the Plan.

37.     At no time prior to the closing of the Microchip-Atmel merger on April 4, 2016 did Microchip suggest or indicate to Atmel or to any plaintiff or class member that Microchip had any understanding or interpretation of the Severance Guarantee Plan that was different than the interpretation that Atmel had communicated to its employees.  At no time prior to the closing of the Microchip-Atmel merger on April 4, 2016 did Microchip suggest or indicate to Atmel or to any plaintiff or class member that the Severance Guarantee Plan had "expired" or was otherwise not in

effect; nor did Microchip ever suggest or indicate to Atmel or to any plaintiff or class member that Atmel employees would have no right to any severance benefits under the Severance Guarantee Plan if Microchip terminated their employment without cause following the merger.  At no time prior to the closing of the Microchip-Atmel merger on April 4, 2016 did Microchip suggest or indicate to Atmel or to any plaintiff or class member that Microchip intended to terminate Atmel employees following the merger without providing the severance benefits guaranteed by the Plan, or intended to assert that the Plan had "expired" or that Microchip had no obligation to pay terminated Atmel employees any of the severance benefits set forth in the Severance Guarantee Plan.  Microchip intended its pre-merger statements and actions to cause Atmel employees reasonably to understand and believe that Microchip intended to pay the severance benefits set forth in the Plan upon terminating any such employee without cause before March 19, 2017, as provided by the Plan.

38.    Until April 4, 2016, plaintiffs and class members did not know, and had no reason to know, that Microchip did not intend to, and would not, honor its obligations under the Severance Guarantee Plan to pay the severance benefits guaranteed by the Plan to employees it terminated without cause.

### *Microchip's Post-Merger Conduct and Denial of Benefits under the Plan*

39.    Atmel became a wholly owned subsidiary of Microchip upon the April 4, 2016 merger.  That merger constituted a "Change of Control" within the meaning of the Plan, entitling any former Atmel employee terminated without cause by Microchip after the merger to the severance benefits provided by the Severance Guarantee Plan.  During the week immediately following the April 4, 2016 merger, Microchip terminated dozens of Atmel employees without cause, including plaintiff Schuman.  Each of those former Atmel employees thereby became entitled to severance benefits provided by the Plan.

40.    Even though Microchip had represented to Atmel and its employees for months that it would honor the Severance Guarantee Plan, and even though Microchip deliberately caused Atmel and its employees to believe that Microchip would pay terminated employees the severance benefits provided by the Plan, Microchip's actual plan and intent was to falsely claim that the Plan had "expired" and to refuse to pay terminated employees the severance benefits due to them under the

Plan. Notwithstanding Microchip's repeated representations and assurances to Atmel and its employees, and despite Microchip's knowledge and understanding that it was obligated to pay terminated employees the severance benefits set forth in the Plan, Microchip did not make these severance payments. Instead, Microchip intimidated and coerced Atmel employees, through false and misleading representations and economic pressure, and in violation of its fiduciary duties under ERISA, into accepting significant "discounts" on the severance benefits those employees were legally owed and guaranteed under the Plan, in order to save Microchip money.

41. Between April 4, 2016 and April 6, 2016, Microchip terminated numerous Atmel employees without cause ("the Initial Terminated Employees"). On or about the time it terminated these employees, Microchip announced for the first time its position that the Severance Guarantee Plan had "expired" once Microchip replaced Dialog as the acquiring company and that consequently, it had no obligation to pay, and would not pay, the severance benefits provided by the Plan to any of the Initial Terminated Employees. Microchip further announced that, based on its position that the Plan had "expired" several months earlier, no Atmel employees were entitled to any severance benefits under the Plan; Microchip was not obligated to pay any severance benefits to any former Atmel employees under the Plan; and Microchip would not pay severance benefits to any former Atmel employees under the Plan.

42. On or about April 6, 2016, Microchip sent letters to the Initial Terminated Employees in which it offered to pay them between four to six weeks of salary each as severance (or alternatively to pay them no cash severance whatsoever but instead to give them certain Restricted Stock Units) if they would sign a release of all claims against Microchip and its affiliates, including a release of all claims based on the enforceability of the severance benefit provisions of the Plan ("the April 6 Offer and Release"). Each Initial Terminated Employee was entitled to a substantially greater amount of benefits under the Plan than the four to six weeks of salary (or Restricted Stock Units) offered by Microchip. Microchip knowingly and intentionally represented falsely to the Initial Terminated Employees that they had no right to severance benefits under the Plan, which Microchip wrongfully and fraudulently claimed had ceased to exist. Microchip also knowingly and intentionally failed to inform any of the Initial Terminated Employees that the Plan was still in

existence and in effect, that the Initial Terminated Employees had rights under ERISA because they were beneficiaries of the Plan (including rights to appeal any denial of a claim for ERISA benefits under the Plan), or that pursuant to the Plan and the statutory protections provided by ERISA, the Initial Terminated Employees were entitled to substantially and materially greater benefits than Microchip was offering them under its April 6 Offer and Release.  By these deliberate and knowing acts of omission and commission, Microchip breached its fiduciary duties under ERISA.

43.     Microchip's offer to pay between four to six *weeks* of salary (or certain Restricted Stock Units) as severance to the Initial Terminated Employees was an offer to pay only a small fraction of the amount the Initial Terminated Employees were entitled to receive under the Severance Guarantee Plan, which provided between four to six *months* of salary as severance (depending on job level), plus a pro-rata portion of the employee's annual incentive bonus, plus several months of paid COBRA premiums.

44.     Between approximately April 11, 2016 and April 13, 2016, Microchip sent the Initial Terminated Employees (including plaintiff Schuman) a second letter, increasing its offer to pay them severance benefits in the amount of 50% of the cash salary benefit that would be due under the Plan, 50% of the pro-rated bonus payments that would be due under the Plan, and 50% of the health insurance premium payments that would be due under the Severance Guarantee Plan (the "April 50% Offer and Release").  The April 50% Offer and Release required the Initial Terminated Employees to sign a release of all claims against Microchip as a condition of accepting this offer, including all claims based on the enforceability of the severance benefit provisions of the Plan and all claims for the full amount of benefits due under the Plan.  Microchip knowingly and intentionally failed to inform any of the Initial Terminated Employees in the April 50% Offer and Release or at any other time that the Plan was still in existence and in effect, that the Initial Terminated Employees had rights under ERISA because they were beneficiaries of the Plan, or that pursuant to the Plan and the statutory protections provided by ERISA, the Initial Terminated Employees were entitled to substantially and materially greater benefits than Microchip was offering them under its April 50% Offer and Release.  By these deliberate and knowing acts of omission and commission, Microchip breached its fiduciary duties under ERISA.

45.     Microchip knowingly and intentionally misled and misrepresented to the Initial Terminated Employees in its April 6 Offer and Release and in its April 50% Offer and Release that the only severance benefits available to those Initial Terminated Employees were the benefits Microchip offered in its April 6 Offer and Release and its April 50% Offer and Release, and that the Initial Terminated Employees had no rights to the additional benefits provided by the Plan because the Plan, according to Microchip's knowingly false representatives, had ceased to exist.  Microchip made these false, misleading, and fraudulent statements despite knowing that they were false, and despite knowing that the Initial Terminated Employees were entitled to the severance benefits provided by the Plan.  Microchip coerced, intimidated, and threatened the Initial Terminated employees to accept its April 6 Offer and Release and the April 50% Offer and Release by falsely informing them that if they did not sign Microchip's April 6 Offer and Release or the April 50% Offer and Release, they would receive no severance benefits whatsoever.  Microchip made these statements in a deliberate effort to mislead, intimidate and coerce the Initial Terminated Employees into foregoing their severance rights, as part of a calculated plan by Microchip to save itself money by wrongfully refusing to pay the full severance benefits due under the Severance Guarantee Plan and by attempting to intimidate terminated employees into taking less than what they were actually owed.  By these deliberate and knowing acts of omission and commission, Microchip violated its fiduciary duties under ERISA.

46.     As a result of Microchip's false and threatening statements and bad faith conduct, many Initial Terminated Employees (including plaintiff Schuman) were coerced into signing the April 50% Offer and Release.

47.     Most Atmel employees were not terminated in the first few days after the April 4, 2016 Merger, but continued to be employed by Microchip ("Continuing Employees").  Each of those Continuing Employees who was, or who will be, terminated without cause before March 19, 2017 are entitled to the full amount of severance benefits provided by the Severance Guarantee Plan. Nonetheless, between April 6, 2016 and continuing to the present, Microchip has terminated hundreds of Continuing Employees without cause, yet Microchip has failed and refused to pay any Continuing Employee terminated without cause the benefits owed to those employees under the

Plan.

48.     Between approximately April 11, 2016 and April 13, 2016, Microchip distributed to each Continuing Employee a "new" severance agreement ("the Continuing Employee Diminished Benefits Offer" or "CEDBO").  The terms of Microchip's CEDBO were similar in most material respects to the terms of the April 50% Offer and Release that Microchip had distributed to the Initial Terminated Employees.  Under the terms of the CEDBO, any Continuing Employee who was terminated without cause by Microchip before March 9, 2017 would receive only 50% of the cash salary benefit that would be due under the Plan, 50% of the pro-rated bonus payments that would be due under the Plan, and 50% of the health insurance premium payments that would be due under the Severance Guarantee Plan.  Microchip required each Continuing Employee, as a condition of becoming eligible for any of the benefits offered by Microchip in the CEBDO, to agree to: a) sign the CEDBO and b) upon his or her termination, to sign a modified version of the April 50% Offer and Release ("the Continuing Employee 50% Offer and Release"). The CEDBO thus required Continuing Employees to release all claims against Microchip and its affiliates, including all claims based on the enforceability of the severance benefit provisions of the Plan and all claims for the full amount of benefits due under the Plan.

49.     Microchip knowingly and intentionally misled and misrepresented to the Continuing Employees in the CEDBO and in the Continuing Employee 50% Offer and Release that the only severance benefits available to those Continuing Employees were the benefits Microchip offered in the CEDBO and in the Continuing Employee 50% Offer and Release, and that the Continuing Employees had no rights to the additional benefits provided by the Plan because the Plan, according to Microchip's knowingly false representations, had ceased to exist.  Microchip made these false, misleading, and fraudulent statements despite knowing that they were false, and despite knowing that the Continuing Employees were entitled to the severance benefits provided by the Plan if they were terminated without cause before March 19, 2017.  Microchip coerced, intimidated, and threatened the Continuing Employees to accept its CEDBO and its Continuing Employee 50% Offer and Release by falsely informing them that if they did not sign Microchip's CEDBO and Continuing Employee 50% Offer and Release, they would receive no severance benefits whatsoever.  Microchip

made these statements in a deliberate effort to mislead, intimidate and coerce the Initial Terminated Employees into foregoing their severance rights, as part of a calculated plan by Microchip to save itself money by wrongfully refusing to pay the full severance benefits due under the Severance Guarantee Plan and by attempting to intimidate terminated employees into accepting a substantial discount on what they were actually owed.  Microchip knowingly and intentionally failed to inform any Continuing Employees in its CEDBO and in its Continuing Employee 50% Offer and Release, or at any other time, that the Plan was still in existence and in effect, that the Continuing Employees had rights under ERISA because they were beneficiaries of the Plan, or that pursuant to the Plan and the statutory protections provided by ERISA, the Continuing Employees who were terminated without cause before March 19, 2017 were entitled to substantially and materially greater benefits than Microchip was offering them under its CEDBO and under its Continuing Employee 50% Offer and Release.  By these deliberate and knowing acts of omission and commission, Microchip breached its fiduciary duties under ERISA.

50.     As a direct and proximate result of Microchip's false and misleading statements, threats, intimidation, and coercion, and its wrongful failure to convey complete and accurate information about the benefits to which terminated employees were entitled under the Severance Guarantee Plan, Microchip caused many Continuing Employees to sign the CEDBO in April 2016 and then to sign the Continuing Employee 50% Offer and Release upon their termination without cause.

51.     Plaintiff Coplin signed the CEDBO in April 2016 and was subsequently terminated without cause.  Following his termination without cause, plaintiff Coplin signed the Continuing Employee 50% Offer and Release.

52.     No plaintiff or class member would have signed Microchip's April 6 Offer and Release, its April 50% Offer and Release, its CEDBO, or its Continuing Employee 50% Offer and Release (collectively the "Reduced Benefit Documents") if defendants had accurately informed that employee of the employee's right to severance benefits under the Plan and if defendants had not falsely stated that the Plan had ceased to exist and falsely represented that the employee had no right to any severance benefits under the Plan.

53.     Some of the Atmel employees who were terminated after the April 4, 2016 merger did not sign any of the Reduced Benefit Documents.  Defendants refused to pay these employees any of the severance benefits due to them under the Severance Guarantee Plan.  Some of these employees submitted formal written claims to defendants pursuant to ERISA and the Severance Guarantee Plan, and demanded that defendants pay them the full severance benefits due to them under the Severance Guarantee Plan.  Despite having no justification for doing so, defendants have deliberately and repeatedly delayed giving responses to these claims, in an effort to induce more terminated employees to agree to take less severance benefits than they were due under the terms of the Plan and to sign unlawful releases.  In deliberately and repeatedly delaying their responses to these formal written claims without justification and for these improper purposes, defendants have breached their fiduciary duties.

54.     Plaintiffs are informed and believe that at all relevant times herein, defendants Microchip, Atmel, and the Severance Guarantee Plan were the agents of each other, and were acting within the course and scope of such agency.  To the extent that said conduct and/or omissions were perpetrated by defendants and their agents, defendants confirmed and ratified said conduct and/or omissions.

### CLASS ACTION ALLEGATIONS

55.     <u>Proposed Classes, and the Nature of the Class Claims</u>. Plaintiffs, as Class Representatives, bring this action on their own behalf and on behalf of a proposed class comprising all former U.S.-based employees of Atmel who were employed as of the April 4, 2016 closing date of the Atmel-Microchip merger, including those who were terminated without cause after that date and those who may be terminated without cause before March 19, 2017.  If the facts obtained through discovery establish the appropriateness of subclasses to distinguish among class members who have and have not yet been terminated without cause, or among class members who did or did not execute the various releases that Microchip demanded they sign, plaintiffs will amend this complaint or otherwise inform defendants and the Court of their intent to pursue subclasses.

56.     The claims herein have been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) because Plaintiffs can

demonstrate the prerequisites of Rule 23(a) (numerosity, commonality, typicality, and adequacy) are satisfied; defendants have acted or refused to act on grounds that apply generally to the class, such that declaratory and injunctive relief is appropriate for the class as a whole; and common questions of law and fact predominate over any questions affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

57.   <u>Numerosity</u>.  The class and any potential subclasses are sufficiently numerous because the class is composed of approximately 1,700 former Atmel employees (including more than 400 Atmel employees who have already been terminated without cause since the April 4, 2016 merger) and each potential subclass includes dozens of members.  The identity of the class members and potential subclass members is ascertainable because those individuals are identified in Microchip's payroll and employment records.

58.   <u>Predominant Common Questions of Law and Fact</u>. There exist common questions of law and fact affecting the rights of all class members, and those common issues predominate over individualized issues.  Common questions applicable to the class include, but are not limited to:

(a)   Whether, under the Plan Documents, Atmel's definitive agreement with Dialog constituted an "Initial Triggering Event" that resulted in the Severance Guarantee Plan being extended for 18 months and remaining in effect after Atmel accepted Microchip's offer and a Change in Control occurred pursuant to Atmel's merger with Microchip;

(b)   Whether Microchip breached its fiduciary duties under ERISA by attempting to coerce class members to accept only a portion of the severance benefits to which they were or would be entitled under the Severance Guarantee Plan, despite knowing that Atmel employees terminated without cause after the merger were entitled to 100% of the severance benefits provided by the Plan;

(c)   Whether Microchip breached its fiduciary duties under ERISA by attempting to coerce class members to release claims against Microchip pursuant to the April 6 Offer and Release, the April 50% Offer and Release, or the Continuing Employee 50% Offer and Release, or by attempting to coerce

class members to sign the Continuing Employee Diminished Benefits Offer, despite knowing that Atmel employees terminated without cause after the merger were entitled to 100% of the severance benefits provided by the Plan;

(d)     Whether Microchip breached its fiduciary duty under ERISA by attempting to coerce class member to release claims against Microchip pursuant to the April 6 Offer and Release, the April 50% Offer and Release, or the Continuing Employee 50% Offer and Release, or by attempting to coerce class members to sign the Continuing Employee Diminished Benefits Offer, without conveying complete and correct information about the Plan and its benefits, including the information that class members terminated without cause before March 19, 2017 were entitled to materially greater benefits under the Severance Guarantee Plan than Microchip was offering;

(e)     Whether Microchip breached its fiduciary duties under ERISA by knowingly making false and misleading representations to class members before the Merger closed that Microchip would honor the terms of the Severance Guarantee Plan, thus causing class members to believe they would be entitled to the full amount of benefits provided by the Plan if they continued their employment until terminated without cause before March 19, 2017;

(f)     Whether Microchip should be equitably estopped from denying class members who are or will be terminated without cause before March 19, 2017 the full amount of benefits due to such terminated employees under the Plan;

(g)     Whether plaintiffs and class members are entitled to declaratory, injunctive, or other equitable relief, including the remedy of equitable surcharge, pursuant to ERISA or at common law to remedy defendants' breaches of fiduciary duty, wrongful, unfair, and unlawful conduct as alleged herein.

59.     <u>Typicality</u>. The claims of the named plaintiffs are typical of the claims of all class members.  As more fully set forth herein, each plaintiff was employed by Atmel before the closing date of Atmel's merger with Microchip and was eligible to participate in the Plan and to receive the

1  full amount of benefits provided by the Plan if terminated without cause before March 19, 2017.

2  Each plaintiff was misled and coerced into signing a release in exchange for severance benefits, or

3  the right to receive severance benefits, that were materially less than the benefits plaintiffs were

4  entitled to receive under the Plan, and no plaintiff would have signed such a release if defendants

5  had complied with their fiduciary duty to provide true, accurate, and timely information concerning

6  the plaintiff's entitlement to the full amount of benefits provided by the Plan if terminated without

7  cause before March 19, 2017.  Plaintiff Schuman and plaintiff Coplin were induced by Microchip to

8  sign the April 50% Offer and Release and/or the CEDBO and/or the Continuing Employee 50%

9  Offer and Release.

10       60.    Adequacy of Class Representation. Plaintiffs can adequately and fairly represent the

11  interests of the class as defined above because their individual interests are consistent with, and not

12  antagonistic to, the interests of the other class members, and because they have retained counsel who

13  possess the requisite resources and ability to prosecute this case as a class action and are experienced

14  labor and employment attorneys who have successfully litigated other class action cases.

15       61.    Superiority of Class Action Mechanism. Class certification is appropriate because

16  common questions of law and fact predominate over any questions affecting only individual class

17  members.  Defendants' liability in this action is based on a uniform policy and practice, a uniform

18  set of Offers and Releases, and legal questions applicable to all class members. The amount of

19  restitution or other economic recovery owed to each individual class member is small in relation to

20  the expense and burden of individual litigation to recover those amounts.  The amount of restitution

21  or other economic recovery owed to each individual class member is easy to calculate because

22  defendants offered all class members, in writing, 50% of the full amount to which they are entitled

23  under the Severance Guarantee Plan.  The prosecution of separate actions against defendants by

24  individual class members would create a risk of inconsistent or varying adjudications that would

25  establish incompatible standards of conduct for defendants.  For these and other reasons, a class

26  action is superior to other methods for the fair and efficient adjudication of the controversy set forth

27  in this Complaint.

28  ///

**FIRST CAUSE OF ACTION**
**Breach of Fiduciary Duties and the Remedies of Equitable Relief (Rescission),**
**Equitable Estoppel and Surcharge**
**(ERISA Section 502(a)(3), 29 U.S.C. §1132(a)(3))**

62.     Plaintiffs incorporate herein by specific reference, as though fully set forth, the allegations in paragraphs 1 through 61.

63.     The Severance Guarantee Plan is a plan within the meaning of ERISA.

64.     At all relevant times, defendants have been fiduciaries with respect to the Plan's participants, including plaintiffs and class members.  As fiduciaries, defendants have owed to all Plan participants a duty of loyalty, which includes the duty to convey complete and accurate information when communicating to Plan participants about benefits under the Severance Guarantee Plan, and which further includes the duty not to make misrepresentations or misleading statements or omissions when communicating to Plan participants about benefits under the Plan.

65.     Between the September 17, 2015 Initial Triggering Event and the April 4, 2016 merger closing date, defendants communicated with the Severance Guarantee Plan's participants regarding their benefits under the Plan, and repeatedly and knowingly made material misrepresentations and misleading statements and omissions about defendants' intent and willingness to provide the benefits due under the Plan to the Plan's participants.  Defendants falsely and misleadingly stated that they intended to honor the terms of the Plan and they deliberately led Plan participants to believe that defendants would provide all benefits described in the Plan Documents.  When defendants made those statements and deliberately led the Plan participants to believe that defendants intended to provide the full amount of severance benefits set forth in the Plan to all participants who were terminated without cause before March 19, 2017, including plaintiffs and class members, defendants had no such intention of honoring the Plan's terms or of providing the benefits set forth in the Plan.  Defendants were fully aware and understood before the merger closed that Atmel, as the drafter and creator of the Plan and as the Plan Administrator, believed and understood that the Plan was intact and in existence, and that if Microchip acquired Atmel, the Plan's participants would be entitled to receive all benefits set forth in the Plan if they were terminated without cause before March 19, 2017.  Defendants were also fully aware and understood

1  before the merger closed that defendants were communicating these beliefs to the Plan participants.

2  Defendants were also fully aware and understood before the merger closed that defendants had led

3  Plan participants to believe that Microchip had the same understanding and belief as Atmel with

4  respect to the Plan being intact and in existence and with respect to the right of Plan participants to

5  receive the benefits of the Plan if those participants were terminated without cause before March 19,

6  2017.  At no time prior to the merger closing did defendants or any of them suggest or indicate to the

7  Plan participants, including plaintiffs and class members, that Microchip had any different

8  interpretation or understanding of the Plan than Atmel had presented to those participants.

9       66.    The April 6 Offer and Release, April 50% Offer and Release, CEDBO, and

10  Continuing Employee 50% Offer and Release (collectively "the Reduced Benefit Documents"), each

11  offered severance benefits to Plan participants, including plaintiffs and class members, that were

12  substantially and materially lower in value than the benefits to which those participants were entitled

13  under the Severance Guarantee Plan, and defendants offered those reduced benefits to Plan

14  participants, including plaintiffs and class members, only in exchange for a general release of all

15  claims against defendants, including a release of all claims to obtain or recover the full benefits

16  provided by the Plan.  At no point after the merger closing date did defendants communicate to Plan

17  participants, including plaintiffs and class members, that under the Severance Guarantee Plan, those

18  participants were in fact entitled to substantially and materially greater benefits than the benefits

19  offered in the Reduced Benefit Documents in exchange for a general release of all claims.

20       67.    When defendants falsely represented to Plan participants, including plaintiffs and

21  class members, that the Severance Guarantee Plan was in effect and would provide severance

22  benefits under its terms to all participants who were terminated without cause between the merger

23  close date and March 19, 2017, defendants knew that that after the Merger closed on April 4, 2016

24  defendants would: a) falsely represent to Plan participants that the Plan had expired; 2) falsely claim

25  that Atmel employees had no right to any benefits under the Plan; 3) falsely claim that defendants

26  had no obligation to pay any benefits under the Plan and 4) refuse to pay employees terminated

27  without cause before March 19, 2017 the benefits provided by the Plan.  Defendants also knew that

28  they would attempt to threaten, intimidate, and coerce Plan participants into executing releases of

1   claims for Plan benefits and accepting far less in severance benefits than those employees were or

2   would be entitled to receive under the Plan, by means of making the false representations above.

3       68.     Defendants' failure to convey complete and accurate information about the benefits to

4   which Plan participants, including plaintiffs and class members, were entitled under the Severance

5   Guarantee Plan at the time defendants presented those participants with the Reduced Benefit

6   Documents, caused those participants to be materially misinformed as to whether, and in what

7   amount, they were or would be entitled to severance benefits under the Plan.  Defendants knowingly

8   and deliberately failed to inform Plan participants, including plaintiffs and class members, that they

9   were actually entitled to greater severance benefits than those offered in exchange for their execution

10  of the Reduced Benefit Documents.  Defendants also falsely and/or fraudulently stated or implied, in

11  presenting the Reduced Benefit Documents to Plan participants, that the Plan had "expired" and that

12  those participants, including plaintiffs and class members, were not entitled to any benefits

13  whatsoever under the Plan, even though defendants knew and understood at the time that those

14  participants were entitled to 100% of the benefits provided by the Plan if they were terminated

15  without cause before March 19, 2017, and even though defendants also knew and understood that

16  they had deliberately led those participants to believe before the Merger closed that they would

17  receive 100% of the benefits provided by the Plan if terminated without cause before March 19,

18  2017.

19      69.     Defendants breached their fiduciary duty to Plan participants, including plaintiffs and

20  class members, by engaging in the acts and omissions described above, including by: a) failing to

21  disclose prior to the Merger that defendants did not intend to provide the benefits described in the

22  Plan; b) affirmatively misrepresenting that defendants would honor the Severance Guarantee Plan

23  when defendants did not intend to do so; c) deliberately misleading those participants into believing

24  that defendants would pay the full amount of severance benefits provided by the Plan to all

25  participants who were terminated without cause before March 19, 2017; d) failing to pay the full

26  amount of severance benefits provided by the Plan to all participants who were terminated without

27  cause before March 19, 2017; e) continuing to seek unlawful releases of claims from plaintiffs and

28  class members even after having been put on notice that such efforts were unlawful and a breach of

defendants' fiduciary duties; f) delaying without justification their response to plaintiffs' efforts to exhaust administrative remedies under ERISA in order to avoid and delay paying benefits legally due; and g) delaying without justification their response to plaintiffs' claims in an effort to get more employees to agree to take less severance benefits than they were due under the terms of the Plan.

70.     None of defendants' Reduced Benefit Documents refers to, mentions, or identifies ERISA or advises Plan participants, including plaintiffs and class members, that those participants have any rights under ERISA or any right to benefits under ERISA and/or the Severance Guarantee Plan.  Nor do any of defendant's Reduced Benefit Documents specifically refer to or identify the Severance Guarantee Plan or specifically disclose that accepting any of the Reduced Benefit Documents is tantamount to waiving the severance benefits to which the terminated employee is entitled under the Severance Guarantee Plan.

71.     Defendants' acts and omissions as set forth above constitute a breach of defendants' fiduciary duties under Section 404(a) of ERISA, 29 U.S.C. §1104(a).

72.     Plaintiffs and class members have suffered economic and other harm as the direct and proximate result of defendants' false and misleading statements, omissions, and commissions alleged herein, including defendants' conduct in inducing plaintiffs and class members to remain employed by Atmel and Microchip by promising benefits that defendants did not intend to provide and did not provide, and defendants' conduct in denying the existence of Plan benefits to Plan participants and as part of a scheme to defraud Plan participants into executing waivers of their right to obtain the benefits provided by the Plan.

73.     Plaintiffs and class members have suffered and will continue to suffer irreparable harm if defendants are not preliminarily and permanently enjoined from: a) enforcing any releases obtained from such plaintiffs and class members as a result of defendants' false and misleading statements, omissions, and commissions alleged herein; b) failing to pay the full amount of benefits provided by the Plan to Plan participants, including plaintiffs and class members herein, who were or are terminated without cause between the Merger close date and March 19, 2017; c) continuing to seek releases of claims for Plan benefits from plaintiffs and class members; and d) continuing to administer the Plan in bad faith, as alleged herein.

74.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, plaintiffs and class members are entitled to a declaration that the Plan exists and is valid and enforceable, that any releases obtained by defendants' misrepresentations and other wrongful conduct are void and unenforceable, and that all Plan participants, including plaintiffs and class members, are entitled to receive the full amount of benefits provided by the Plan if they were, or are, terminated without cause by defendants at any time between the Merger close date and March 19, 2017.

75.     Pursuant to Section 502(a) of ERISA, 29 U.S.C. §1132(a)(3), plaintiffs and class members are entitled to rescission of all releases and Reduced Benefit Documents obtained by defendants through the misrepresentations, breaches of fiduciary duty, and other wrongful conduct alleged herein, and restitution of the full amount of benefits to which they would otherwise be entitled under the Plan if they were or are terminated without cause by defendants between the Merger close date and March 19, 2017, and defendants should be equitably estopped from disputing the Plan participants' entitlement to the full amount of severance benefits provided by the Severance Guarantee Plan if those participants were, or are, terminated without cause by defendant at any time between the Merger close date and March 19, 2017.

76.     Pursuant to Section 409 of ERISA, 29 U.S.C. §1109(a) and Section 502(a) of ERISA, 29 U.S.C. §1132(a), plaintiffs are entitled to the removal and replacement of Microchip as Plan Administrator with a new and different Plan Administrator that complies with its fiduciary obligations to Plan participants.

77.     Because defendants benefited from their own fiduciary breaches at the expense of the Plan participants, including plaintiffs and class members, by paying Plan participants a lower amount of severance benefits than those participants were entitled to under the Severance Guarantee Plan, plaintiffs are entitled to recover as an equitable surcharge the difference between what defendants paid them in severance benefits and what defendants should have paid them in severance benefits, plus interest and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief as follows:

1.     For certification of the action as a class action under Rules 23(b)(2) and (b)(3);

2.      For an order appointing plaintiffs as class representatives and plaintiffs' counsel as class counsel;

3.      For an injunction against defendants, preliminarily and permanently enjoining them from: a) enforcing any releases obtained from plaintiffs and class members as a result of defendants' false and misleading statements, omissions, and commissions alleged herein, b) failing to pay the full amount of benefits provided by the Plan to Plan participants, including plaintiffs and class members herein, who were or are terminated without cause by defendants between the Merger close date and March 19, 2017; c) continuing to seek releases of claims for Plan benefits from plaintiffs and class members; and d) continuing to administer the Plan in bad faith, as alleged herein.

4.      For a declaration that the Plan exists and is valid and enforceable, that any releases obtained by defendants' misrepresentations and other wrongful conduct are void and unenforceable, and that all Plan participants, including plaintiffs and class members, are entitled to receive the full amount of benefits provided by the Plan if they were, or are, terminated without cause by defendant at any time between the Merger close date and March 19, 2017;

5.      For an order rescinding all releases and Reduced Benefit Documents obtained by defendants through their misrepresentations, breaches of fiduciary duty, and other wrongful conduct, and restitution of the full amount of benefits to which plaintiffs and class members would otherwise be entitled under the Plan if they were or are terminated without cause by defendants between the Merger close date and March 19, 2017;

6.      For an order equitably estopping defendants from disputing the Plan participants' entitlement to the full amount of severance benefits provided by the Severance Guarantee Plan if those participants were, or are, terminated without cause by defendant at any time between the Merger close date and March 19, 2017.

7.       For the equitable relief of surcharge, including the return of the financial benefits Defendants gained by breaching their fiduciary duties to Plaintiffs and the proposed Subclasses;

8.      For interest on all sums awarded;

9.      For attorneys' fees and the costs of action in an amount the Court determines to be reasonable, pursuant to ERISA Section 502(g)(1), 29 U.S.C. §1132(g)(1), and any other applicable

1   provisions providing for attorneys' fees and costs;

2       10.     For such other and further relief as the Court deems just and proper.

3

4                               Respectfully submitted,

5   Dated: September 29, 2016        **ALTSHULER BERZON LLP**
                                     MICHAEL RUBIN
6                                    CONNIE K. CHAN
                                     RAPHAEL N. RAJENDRA
7

8                                    **MCGUINN, HILLSMAN & PALEFSKY**
                                     CLIFF PALEFSKY
9                                    KEITH EHRMAN

10

11                                   By: _____/s/ Keith Ehrman_____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28