UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PETER SCHUMAN, et al.,

Plaintiffs,

v.

MICROCHIP TECHNOLOGY
INCORPORATED, et al.,

Defendants.

Case No. 16-cv-05544-HSG

**ORDER GRANTING CLASS CERTIFICATION**

Re: Dkt. No. 107

Pending before the Court is the motion for class certification filed by Plaintiffs Peter Schuman and William Coplin. *See* Dkt. No. 107. The Court held a hearing on June 27, 2019. *See* Dkt. No. 113. For the reasons detailed below, the Court **GRANTS** the motion for class certification.

## I.    BACKGROUND

Plaintiffs filed this putative class action in September 2016, alleging violations of the Employee Retirement Income Security Act ("ERISA"). *See* Dkt. No. 1. Plaintiffs allege that their former employer Atmel Corporation and Atmel's merger partner Microchip Technology, Inc., which acquired Atmel in April 2016, failed to honor the terms of their employee severance agreements under the Atmel Corporation U.S. Severance Guarantee Benefit Program (the "Atmel Plan"). *See* Dkt. No. 29 ("FAC") at ¶¶ 1–2.

### A.    Factual Background

#### i.    The Atmel Plan

In July 2015, Atmel created the Atmel Plan to encourage its approximately 1,800 U.S. employees to continue working for the company while Atmel searched for a merger partner. *See* FAC at ¶¶ 2, 18–19. Only July 9, 2015, Atmel delivered personalized letters to employees

describing the employees' benefits under the Atmel Plan.  *See id.* at ¶ 20; *see also* Dkt. No. 107-2, Ex. H at 6–8.[1]  The letters detailed the three primary severance benefits of the Atmel Plan:  (1) a cash payment of between 25 percent and 50 percent of annual base salary, depending on the class of employee; (2) paid health insurance premiums for between three to six months, again depending on the class of employee; and (3) a prorated portion of the employee's annual incentive bonus for director-level and professional exempt employees.  *See* FAC at ¶ 21; *see also* Dkt. No. 107-2, Ex. H at 6.  In an addendum to the letter, Atmel set forth the terms of the Atmel Plan:

> **Term of the Severance Guarantee Benefit Program:**  The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.
>
> . . .
>
> **Initial Triggering Event:**  Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.
>
> **Benefits Conditions:**  After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:
>
> A.  A Change of Control actually occurs; and
>
> B.  Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

Dkt. No. 107-2, Ex. H at 7.  Atmel's successor would "assume the obligations" of the Atmel Plan. Dkt. No. 107-2, Ex. H at 8.  The Atmel Plan would also "be administered and interpreted by"

---

[1] The evidence that the parties cite and rely on contains various Bates Stamp numbering and pagination.  For ease of reference, unless otherwise specified, the Court's citations refer to the PDF pagination in each docket entry.

Atmel.  *Id.*

### ii.        Atmel's Merger with Microchip

On September 19, 2015, Atmel and Dialog Semiconductor PLC executed and publicly announced a formal merger agreement.  *See* Dkt. No. 107-1, Ex. D. at 121–66.  However, the agreement between Atmel and Dialog never closed because Microchip made a better offer.  *Id.* at 113, 167–68; *see also* Dkt. No. 107-2, Ex. H at 2.  After Dialog declined to match or improve upon Microchip's offer, Atmel entered into a merger agreement with Microchip on January 19, 2016. *Id.*

Prior to the closing of the merger, Atmel provided Microchip with documentation relating to the Atmel Plan, including summaries and estimates of how much would be owed to Atmel employees under the Plan.  *See* Dkt. No. 107-1, Ex. A. at 14–19; Dkt. No. 107-1, Ex. B. at 33–36. Atmel's Senior Vice President of Human Resources Suzanne Zoumaras, who helped draft the Atmel Plan, explained that it "was very carefully worded" to ensure benefits would still be available following an Initial Triggering Event, even if there were a superior bid and a Change of Control occurred with a different company.  *See* Dkt. No. 107-1, Ex. A. at 10–13.  Atmel's CEO Steve Laub similarly believed that the Change of Control with the Microchip merger fell within the terms of the Atmel Plan, and as such, discussed the scope of the Atmel Plan with Microchip's CEO Steve Sanghi.  *See* Dkt. No. 107-1, Ex. B at 25–31, 33–36.

At the same time, Atmel also communicated to its employees that the Atmel Plan would remain in effect, regardless of whether the merger was with Dialog or Microchip.  On February 3, 2016, Ms. Zoumaras sent an email to Atmel employees entitled "Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger," which had links to a series of Frequently Asked Questions ("FAQs").  *See* Dkt. No. 107-1, Ex. D at 80–83, 106–114, 233–36, 296–97, 326–27, 340–42; *see also* Dkt. No. 107-3 ("Schuman Decl.") at ¶ 4, & Ex. B; Dkt. No. 107-4 ("Coplin Decl.") at ¶ 4, & Ex. B.  The FAQs indicated that "Microchip has agreed to honor each of your employment and compensatory contracts (including . . . severance . . . agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction" if Microchip acquired Atmel.  *See* Schuman Decl., Ex. B at 12–13; Coplin Decl.,

Ex. B at 10–12.

The merger between Atmel and Microchip closed on April 4, 2016.  Dkt. No. 107-1, Ex. D at 113, 167–68; *see also* Dkt. No. 107-2, Ex. H at 2.

### iii.   Microchip's Post-Merger Conduct

In the days following the merger's closing, Microchip announced its position that the Atmel Plan had expired on November 1, 2015, and that it therefore had no obligation to—and thus would not—pay the severance benefits provided by the Atmel Plan to any terminated employees. *See, e.g.*, Dkt. No. 107-1, Ex. D at 106–14; *id.*, Ex. G at 370–73; Dkt. No. 107-2, Ex. H at 2–5, 9–12; Schuman Decl. at ¶¶ 7–9.  On approximately April 7, 2016, Mr. Singh held an "all-hands" meeting, at which he explained to Atmel employees that the Atmel Plan had expired, and Microchip would not pay any severance benefits under its terms.  *See* Dkt. No. 107-1, Ex. D at 10–11, 113–14; *id.*, Ex. G at 225–27, 233–36, 370–73.  Mr. Singh asserted that "Atmel employees would have to fight him in court if [they] wanted to challenge him on [their] entitlement to benefits under the [Atmel] Plan."  *See* Coplin Decl. at ¶ 5.  During the meeting, Mr. Singh also explained that Microchip was nevertheless willing to offer terminated Atmel employees 50 percent of the benefits provided by the Atmel Plan in exchange for signing a release of claims.  *See id.*

Microchip also began terminating Atmel employees without cause, including Plaintiff Schuman who was terminated on April 6.  *See* Schuman Decl. at ¶¶ 7–8; *see also* Dkt. No. 107-1, Ex. D. at 82–83.  On April 6, 2016, Microchip gave these terminated employees a document titled "Severance Agreement and General Release" ("the April 6 Agreement") offering them four to six weeks of salary as severance in exchange for releasing all claims against Microchip and Atmel, including those "based on the enforceability of the severance benefit provisions of the Plan."  *See* Schuman Decl. at ¶ 9, & Ex. C; *see also* Dkt. No. 107-1, Ex. D. at 82–87.  Plaintiffs state, and Defendants do not appear to contest, that no putative class members signed the April 6 Agreement. *See* Dkt. No. 107 at 5.  Approximately one week later, on April 11, 2016, Microchip sent a second letter to the terminated employees, outlining a more generous severance agreement.  Under the terms of this plan, the former employees would receive severance benefits worth one-half of those offered under the Atmel Plan, in exchange for releasing any claims they may have had against

United States District Court
Northern District of California

1   Atmel and Microchip ("the April 11 Agreement").  *See* Schuman Decl. at ¶ 10, & Ex. D; *see also*

2   Dkt. No. 107-1, Ex. D. at 82–83.  Given Microchip's representations, Plaintiff Schuman and other

3   putative class members signed the April 11 Agreement.  *See, e.g.*, *id.*; *see also* Dkt. No. 107-1.

4   Other putative class members remained employed for some time with Microchip through

5   2016 and part of 2017.  On approximately April 13, 2016, Microchip began distributing to these

6   continuing Atmel employees a "new" severance agreement, entitled "Continuing Employee

7   Diminished Benefits Offer" ("CEDBO").  *See, e.g.*, Coplin Decl. at ¶ 6, & Ex. C; Dkt. No. 107-1,

8   Ex. D at 113–16; Dkt. No. 107-2, Ex. H at 13–1341.  Plaintiffs contend that the CEDBO included

9   substantially the same terms as the April 11 Agreement, offering severance benefits worth one-

10   half of those offered under the Atmel Plan.  *See* Dkt. No. 107 at 6; *compare* Schuman Decl., Ex.

11   D, *with* Coplin Decl., Ex. C.  The CEDBO explained that the employee's eventual receipt of these

12   benefits would require the employee to sign a release of any and all claims.  *See* Coplin Decl., Ex.

13   D.

14   On April 25, 2016, Microchip sent an email to Atmel employees reiterating Microchip's

15   position that the Atmel Plan had "expired."  *See* Dkt. No. 107-1, Ex. E at 173–74.  The letter urged

16   those who did not yet sign the CEDBO to do so by the newly extended deadline, April 28, 2016.

17   *Id.*  Mr. Singh stated in the email that "[y]ou have made your point and you have made your anger

18   known, but the situation if you do not return the signed letters is still lose-lose."  *Id.*  Based on

19   these representations, Plaintiff Coplin and other putative class members signed the CEDBO.  *See,*

20   *e.g.*, Coplin Decl. at ¶ 6, & Ex. C; Dkt. No. 107-2, Ex. H at 13–1341.  Following these employees'

21   subsequent terminations without cause, Microchip demanded that they sign a release, entitled

22   "Employment Separation, Severance and Release" (the "Continuing Employee Release").  As

23   previewed in the CEDBO, and like the April 11 Agreement, the Continuing Employee Release

24   conditioned the employees' receipt of benefits on releasing any claims they may have had against

25   Atmel and Microchip.  *See* Coplin Decl. at ¶ 7, & Ex. D; *see also* Dkt. No. 107-2, Ex. H at 13–

26   1341.

27   Plaintiffs estimate that approximately 200 Atmel employees were participants in the Atmel

28   Plan and were terminated without cause after the merger.  *See* Dkt. No. 107 at 8, & n.5; *see also*

Dkt. No. 107-2, Ex. H at 13–1341.

### ii.   Microchip Denies Plaintiffs' Claims for Benefits

On September 29, 2016, Plaintiff Schuman submitted a claim for benefits under the Atmel Plan to the plan administrator.  *See* Dkt. No. 107-1, Ex. D at 91–101.  Plaintiff Coplin did the same on September 30, 2016.  *See id.* at 64–75.  On December 19, 2016, Microchip's human resources manager, identifying herself as the plan administrator, denied Plaintiffs' claims on eligibility grounds, stating that the Atmel Plan had expired on November 1, 2015, and the agreement with Dialog did not result in a Change in Control, so could not form the basis of any entitlement to benefits under the Atmel Plan.  *See, e.g.*, Dkt. No. 107-1, Ex. D at 76–78, 102–05.  The letter also noted that any release "is not relevant to your claim for benefits."  *Id.*

Plaintiffs appealed the denials on January 23, 2017.  *See* Dkt. No. 107-1, Ex. F at 176–90, 194–208.  The plan administrator denied their appeals on March 23, 2017, again on grounds of eligibility.  *Id.* at 191–92, 209–10.  Again, the plan administrator did not rely on the releases as part of its reasoning.  *Id.*

### B.   Procedural History

### i.   Judicial Proceedings

Plaintiffs filed an action against Defendants on September 29, 2016.  *See* Dkt. No. 1.  In the operative complaint, Plaintiffs allege that Defendants (1) breached their fiduciary duties by misinterpreting the severance agreements as having expired and encouraging Plaintiffs to sign releases in exchange for reduced severance benefits, in violation of Section 404(a) of ERISA, 29 U.S.C. § 1104(a); and (2) improperly denied their claim for benefits, in violation of Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).  *See* FAC at ¶¶ 82–100.  Plaintiffs seek the following relief:  (1) an injunction to prevent Microchip from enforcing the releases it has obtained and from soliciting new claims releases from Plaintiffs; (2) an injunction to prevent Microchip from denying Plaintiffs' entitlement to severance benefits under the Atmel Plan; (3) an order estopping Microchip from denying Plaintiffs' entitlement to severance benefits under the Atmel Plan; (4) a surcharge based on Microchip's unjust enrichment; and (5) to receive benefits due under the Atmel Plan.  *See* Dkt. No. 107 at 8.

On the basis of these allegations, Plaintiffs move to certify a single class, defined as:

> All former U.S.-based employees of defendant Atmel Corporation who were employed as of the April 4, 2016 closing date of the Atmel-Microchip merger and who were terminated by defendant Microchip Technology Incorporated without cause between April 4, 2016 and March 19, 2017.

*See* Dkt. No. 107 at 1. The class excludes those plaintiffs in the related case, *Berman v. Microchip*, Case No. 17-cv-01864, also pending before this Court and explained in more detail in Section I.B.ii. below. *See id.* Plaintiffs seek certification of two claims for relief: (1) equitable relief under Section 502(a)(3), 29 U.S.C. § 1132(a)(3); and (2) improper denial of benefits under Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). *See id.*

### ii.    Related Action

Nine of the former Atmel employees who refused to sign any of Microchip's releases filed a separate action against Defendants on April 4, 2017, in the related action *Berman v. Microchip*, Case No. 17-cv-01864. On March 22, 2019, the Court granted the *Berman* plaintiffs' motion for partial summary judgment. *See* Case No. 17-cv-01864, Dkt. No. 95. The Court concluded that (1) the plaintiffs were entitled to severance benefits under ERISA § 502(a)(1)(B); and (2) the defendants were liable for breach of fiduciary duty under ERISA § 502(a)(3). *See id.* at 9–13.

At the time, the Court did not assess what damages the *Berman* plaintiffs may be entitled to as a result of its ruling regarding liability. *See id.* at 14. The parties subsequently stipulated to the amount of unpaid severance benefits owed each of the plaintiffs, and the plaintiffs filed a motion for summary judgment seeking an additional ten percent per annum, as either an equitable surcharge or prejudgment interest. *See* Dkt. No. 100 at 3–13. On September 3, 2019, the Court denied Plaintiffs' motion, finding that the plaintiffs failed to provide any evidence that would permit the Court to award an equitable surcharge or prejudgment interest above the default interest rate prescribed in 28 U.S.C. § 1961(a). *See* Dkt. No. 112. The plaintiffs subsequently withdrew their request for such a remedy. *See* Dkt. No. 115. The Court entered judgment in favor of the plaintiffs and against the defendants on October 18, 2019, which included plaintiffs' severance benefits and prejudgment interest. *See id.*, Dkt. No. 119.

## II.     CLASS CERTIFICATION STANDARD

Federal Rule of Civil Procedure 23 governs class actions, including the issue of class certification.  Class certification is a two-step process.  To warrant class certification, a plaintiff "bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("A party seeking class certification must affirmatively demonstrate [her] compliance with the Rule.").

Rule 23(a) provides that a district court may certify a class only if:  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If the four prerequisites of Rule 23(a) are met, a court also must find that the plaintiff "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Plaintiffs assert that they meet the requirements of Rule 23(b)(1), 23(b)(2), and 23(b)(3).  *See* Dkt. No. 107 at 10–17.  Rule 23(b)(1) provides for certification where "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."  *See* Fed. R. Civ. P. 23(b)(1)(A).  Rule 23(b)(2) provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3), in turn, applies where there is both "predominance" and "superiority," meaning "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3).  To determine whether a putative class action satisfies the requirements of Rule 23(b)(3), courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

The Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (citing *Dukes*, 564 U.S. 350–51).  However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1194–95; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[A] district court *must* consider the merits if they overlap with the Rule 23(a) requirements.").  The issue to be decided in a certification motion is whether the case should be "conducted by and on behalf of the individual named parties only" or as a class.  *See Dukes*, 564 U.S. at 348.

### III.   DISCUSSION

As noted above, Plaintiffs move to certify a class of approximately 200 former employees of Atmel Corporation who were terminated without cause after Atmel was acquired by Microchip. *See* Dkt. No. 107 at 8, & n.5.  Plaintiffs seek certification of both their claims for breach of fiduciary duty under ERISA Section 502(a)(3) and their claims for improper denial of benefits under Section 502(a)(1)(B).  In response, Defendants assert that Plaintiffs have failed to meet the requirements of Federal Rules of Civil Procedure 23(a) and Federal Rule of Civil Procedure 23(b) because:  (1) resolution of the action will turn on individualized inquiries into the validity of the

class members' releases; (2) Plaintiffs Schuman and Coplin, as director-level employees, were knowledgeable about the Atmel Plan and its limitations, and even worked to disseminate information about the Atmel Plan and the releases; and (3) Plaintiffs' requested relief for equitable surcharge as part of their fiduciary duty claim will require individualized inquiries into class members' specific injuries.  *See* Dkt. No. 108.  The Court addresses each argument in turn as part of its analysis below.

### A. Rule 23(a)

#### i. Numerosity

Rule 23(a) requires that the putative class be "so numerous that joinder of all members is impracticable."  *See* Fed R. Civ. P. 23(a)(1).  Here, the parties do not dispute, and the Court agrees, that the approximately 200-person putative class satisfies the numerosity requirement.  *See* Dkt. No. 108 at 7.

#### iii. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  *See* Fed R. Civ. P. 23(a)(2).  A contention is sufficiently common where "it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350. Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class."  *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008).  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Dukes*, 564 U.S at 350  (emphasis omitted).

Here, Plaintiffs cite five common questions:  (1) whether the Dialog merger agreement satisfied the Atmel Pan's "Initial Triggering Event"; (2) whether Microchip was a fiduciary of the Atmel Plan; (3) whether Microchip violated its fiduciary duty by claiming that the Atmel Plan had expired; (4) whether Microchip obtained claims releases from Plaintiffs in violation of its fiduciary duty; and (5) what equitable and monetary relief Plaintiffs may be entitled to as a result.

10

1    *See* Dkt. No. 107 at 9.  In response, Defendants sidestep the first three questions entirely, noting

2    that the Court addressed similar questions in *Berman v. Microchip*, Case No. 17-cv-01864.  *See*

3    Dkt. No. 108 at 8.  Without conceding that the Court's conclusions in the *Berman* action were

4    correct, Defendants conclude that these questions "should no longer be at issue in this case."  *See*

5    *id.*  Defendants provide no support for the novel idea that as part of its class certification analysis

6    the Court should ignore merits questions that have common answers.  These questions, which will

7    undisputedly generate common answers for the class, are sufficient to satisfy the commonality

8    requirement.  As the Supreme Court has acknowledged "[e]ven a single [common] question will

9    do" for purposes of commonality.  *Dukes*, 564 U.S. at 359 (alterations in original) (quotation

10   omitted).

           **iv.   Typicality**

11

12          Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

13   of the claims or defenses of the class."  Fed R. Civ. P. 23(a)(3).  "The test of typicality is whether

14   other members have the same or similar injury, whether the action is based on conduct which is

15   not unique to the named plaintiffs, and whether other class members have been injured by the

16   same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)

17   (quotation omitted).  Under the "permissive standards" of Rule 23(a)(3), the claims need only be

18   "reasonably co-extensive with those of absent class members," rather than "substantially

19   identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  In other words,

20   typicality is "satisfied when each class member's claim arises from the same course of events, and

21   each class member makes similar legal arguments to prove the defendant's liability."  *Rodriguez v.*

22   *Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quotation omitted).  "The commonality and typicality

23   requirements of Rule 23(a) tend to merge."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–

24   158, & n.13 (1982).  However, typicality—like adequacy—looks at whether Plaintiffs are proper

25   parties to proceed with the suit.  *Id.*

26          Here, Defendants urge that Plaintiffs Schuman and Coplin's claims are not typical of the

27   proposed class because they are subject to unique defenses given their director-level positions.

28   *First*, Defendants argue that Plaintiffs Schuman and Coplin have different bases for seeking

United States District Court
Northern District of California

invalidation of their releases because, as a result of their positions, they were not intimidated or coerced into signing their releases.  *See* Dkt. No. 108 at 12–13.  Defendants repeatedly frame Plaintiffs' claims as turning on individualized allegations that Defendants intimidated or coerced them into signing releases.  *See id.* at 2, 5, 8, 12, 14, 16, 18.  Defendants then argue in response that the named Plaintiffs' claims are not typical because Plaintiff Coplin purportedly disclaimed feeling coerced and was familiar with ERISA given his background in human resources.  *See* Dkt. No. 108-1, Ex. 2 at 54–55.  And Plaintiff Schuman consulted an attorney before signing his release.  *See* Dkt. No. 108-1, Ex. 6 at 76.

Although in the operative complaint Plaintiffs allege that Defendants "intimidated and coerced Atmel employees" into signing releases, *see* FAC at ¶ 52, Plaintiffs' theory is more nuanced.  Plaintiffs allege that Defendants intimidated and coerced Plaintiffs by making "misleading," "false," and "fraudulent" statements about the availability of severance benefits under the Atmel Plan should Plaintiffs fail to sign a release.  *See id.* at ¶¶ 52, 57–58, 61–62, 87.  In short, Plaintiffs explain that it was coercive for Defendants to repeatedly state that the Atmel Plan had expired as of November 1, 2015, and that Defendants did not owe any benefits under the Plan.

That the named Plaintiffs may have had more familiarity with ERISA or even Defendants' interpretation of the Atmel Plan than other class members does not alter their legal arguments.  Plaintiffs have proffered evidence that Defendants repeatedly and seemingly uniformly expressed their stance that the Atmel Plan had expired without an Initial Triggering Event and corresponding Change of Control on November 1, 2015, including to both named Plaintiffs.  *See, e.g.*, Dkt. No. 107-1, Ex. D at 106–14; *id.*, Ex. G at 370–73; Dkt. No. 107-2, Ex. H at 2–5, 9–12; Schuman Decl. at ¶¶ 7–9.  Microchip's CEO, for example, expressed during an all-hands meeting that Microchip would not pay any severance benefits under the Atmel Plan.  *See* Dkt. No. 107-1, Ex. D at 10–11, 113–14; *id.*, Ex. G at 225–27, 233–36, 370–73.  Indeed, Defendants acknowledge that "Microchip believed the Atmel Plan had, by its terms, expired . . . and Microchip communicated that belief to Atmel employees."[2]  *See* Dkt. No. 108 at 4.

---

[2] To the extent that Defendants further argue that the named Plaintiffs may be responsible for some coercion or intimidation, there is simply no support for this in the record.  To the contrary,

United States District Court
Northern District of California

1  The Court understands that Defendants disagree that sharing their interpretation of the

2  Atmel Plan and its expiration date may be considered coercive, misleading, or fraudulent.  Yet the

3  Court's task at the class certification stage is not to evaluate the veracity of Plaintiffs' allegations.

4  It is sufficient to satisfy typicality that under Plaintiffs' legal theory, Defendants uniformly

5  informed Plaintiffs that they were not entitled to benefits under the Atmel Plan.  Their claims

6  "arise from the same course of events" and involve "similar legal arguments to prove

7  [Defendants'] liability."  *See Rodriguez*, 591 F.3d at 1124 (quotation omitted).

8  *Second*, Defendants contend that Plaintiffs Schuman and Coplin were parties to additional,

9  director-level severance agreements not challenged in this action which subject them to unique

10  defenses.  *See* Dkt. No. 108 at 3; *see also* Dkt. No. 108-1, Ex. 3.  Defendants assert that these

11  agreements provided for benefits upon termination without cause "in connection with *any* change

12  of control before August 30, 2016," and Defendants therefore paid them.  *Id.* (emphasis in

13  original).  However, Defendants acknowledge that these director-level agreements were made in

14  addition to the benefits detailed in the Atmel Plan.  *See* Dkt. No. 108 at 3.  Moreover, when

15  Plaintiffs Schuman and Coplin submitted their claims for benefits to the plan administrator, she

16  did not refer to any other severance agreement, but rather concluded that the Atmel Plan had

17  expired on November 1, 2015.  *See* Dkt. No. 107-1, Ex. D at 76–78, 102–05; *see* Dkt. No. 107-1,

18  Ex. F at 191–92, 209–10.

19  Understanding these limitations, Defendants suggest that because the named Plaintiffs

20  knew about these director-level agreements, they could not have been misled by Microchip's

21  FAQs about the merger.  *See* Dkt. No. 108 at 13.  Defendants contend that Plaintiffs Schuman and

22  Coplin knew that there were some severance agreements Microchip would honor (*i.e.*, the

23  director-level agreements), so they could readily harmonize this knowledge with the FAQs that

24  stated Microchip agreed to honor severance agreements with Atmel.  *See* Schuman Decl., Ex. B at

25  12–13; Coplin Decl., Ex. B at 10–12.  The Court is not persuaded that this should defeat

---

27  Plaintiff Coplin explained during his deposition that he "felt pressure" to sign the release given
Microchip's representations, and he "had the general feeling that Microchip was monitoring us
28  very closely" and that had he not signed the release he "would have been terminated
immediately."  See Dkt. No. 108-1, Ex. 2 at 54.

United States District Court
Northern District of California

1    typicality's "permissive standards." *See Hanlon*, 150 F.3d at 1020.  The FAQs were distributed to

2    all employees, not just those at the director level.  And they stated that "Microchip has agreed to

3    honor *each* of your employment and compensatory contracts (including . . . severance . . .

4    agreements) with Atmel," not just director-level severance agreements.  Schuman Decl., Ex. B at

5    12–13 (emphasis added).  As explained above, Plaintiffs' claims turn on Defendants'

6    misinterpretation of the Atmel Plan and their wide circulation of this misinformation—namely,

7    that the Atmel Plan expired.  Plaintiffs Schuman and Coplin received this same information from

8    Microchip, before signing releases.  Again, Plaintiffs' theory is that Microchip violated its

9    fiduciary duty and improperly denied benefits simply by refusing to honor the Atmel Plan.

10        The Court finds that Plaintiffs have thus satisfied the typicality requirement.

11        **v.    Adequacy of Representation**

12        Rule 23(a)(4) requires that the "representative parties will fairly and adequately represent

13    the interests of the class."  Fed. R. Civ. P. 23(a)(4).  On the question of adequacy, the Court must

14    address two legal questions:  (1) whether the named plaintiffs and their counsel have any conflicts

15    of interest with other putative class members, and (2) whether the named plaintiffs and their

16    counsel will prosecute the action vigorously on behalf of the proposed class.  *See In re Mego Fin.*

17    *Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).  This inquiry too "tend[s] to merge" with the

18    commonality and typicality criteria.  *See Falcon*, 457 U.S. at 158, n.13.

19        In arguing that the named Plaintiffs have conflicts of interest with other putative class

20    members, Defendants reiterate that they are subject to unique defenses by virtue of their director-

21    level positions.  Defendants again urge that the named Plaintiffs were not coerced and suggest that

22    they were in fact involved in the dissemination of Defendants' merger materials, including the

23    FAQ.  *See* Dkt. No. 108 at 14–15.  Yet as the Court has already explained, there is evidence in the

24    record that Microchip told even the named Plaintiffs that it would not pay benefits under the Plan.

25    The named Plaintiffs' director-level positions did not somehow insulate them from this alleged

26    misinformation, as Plaintiffs proffer evidence—and Defendants acknowledge—that Defendants

27    consistently stated that the Atmel Plan had expired.  And to the extent that Defendants posit that

28    the named Plaintiffs "may both find themselves on the defensive end of some former employees'

14

United States District Court
Northern District of California

claims of coercion or intimidation," *see* Dkt. No. 108 at 12, Defendants have not provided any reason to believe such a conflict exists, and the Court declines to credit such unsupported conjecture.  Such speculation is particularly unwarranted here where the evidence before the Court indicates that *Microchip* approved of the FAQs before they were circulated, *see* Dkt. No. 107-1, Ex. D at  106–114, and *Microchip* conveyed its position during the all-hands meeting and subsequent emails, *see* Coplin Decl. at ¶¶ 5–6.

Defendants next argue that Plaintiffs cannot establish adequacy of representation because the named Plaintiffs have not suffered actual harm warranting equitable surcharge.  *See* Dkt. No. 108 at 14.  However, Plaintiffs have explained that they are seeking surcharge under an "unjust enrichment theory," and the "surcharge would [] be determined on a class-wide basis, using Microchip's own records, and would not require any individualized findings regarding the extent of any particular class member's injury (financial or otherwise) as a result of Microchip's breach." *See* Dkt. No. 107 at 13.  This theory applies equally to class members.

The Court therefore concludes that Plaintiffs have satisfied the adequacy of representation requirement under Rule 23(a).

**B.   Rule 23(b)**

Having found that Plaintiffs meet the requirements of Rule 23(a), the Court next addresses Plaintiffs' contention that class certification is appropriate under Rule 23(b).

**i.   Rule 23(b)(1)(A)**

Rule 23(b)(1)(A) states that a class may be certified if "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  "Certification under Rule 23(b)(1) is particularly appropriate in cases involving ERISA fiduciaries who must apply uniform standards to a large number of beneficiaries."  *Wit v. United Behavioral Health*, 317 F.R.D. 106, 132–33 (N.D. Cal. 2016).

Plaintiffs contend that their breach of fiduciary duty claim, and their corresponding request for equitable relief, should be certified under Rule 23(b)(1)(A).  Plaintiffs argue that adjudicating

United States District Court
Northern District of California

1    the breach of fiduciary duty claim will not require individualized inquiries, and pursuing only the

2    claims of the named Plaintiffs here risks inconsistent adjudications that would prevent Defendants

3    from treating all plan beneficiaries alike.  *See* Dkt. No. 107 at 11–12.  In response, Defendants

4    challenge both whether certification is appropriate as to liability and whether it is appropriate as to

5    Plaintiffs' request for equitable surcharge.  *See* Dkt. No. 108 at 15–17.

6                    **a.   Liability for Breach of Fiduciary Duty**

7          Defendants contend that Plaintiffs' breach of fiduciary duty claims will require

8    individualized proof, including the specific communications between Defendants and class

9    members.  *See* Dkt. No. 108 at 16.  Defendants repeatedly argue that there are "no specific

10   uniform communications about the at-issue benefits that went to the entire putative class."  *See id.*

11   Defendants urge instead that members of the human resources department were having daily

12   conversations with class members.  *Id.*  Defendants conclude that determining whether these

13   communications were coercive so as to make the class members' releases unenforceable requires

14   an individualized inquiry, and Defendants may have to treat class members differently depending

15   on whether their releases may be enforced.  *Id.*

16         The Court finds that Defendants again have misstated or misunderstood Plaintiffs' theory

17   of liability.  Plaintiffs argue that Defendants breached their fiduciary duty just by asserting that the

18   Atmel Plan expired, stating that Microchip owed no benefits under the Plan, and offering reduced

19   benefit severance plans in exchange for claims releases.  Defendants concede that Microchip's

20   CEO held an "all-hands" meeting, at which he explained to Atmel employees that the Atmel Plan

21   had expired, and Microchip would not pay any severance benefits under its terms.  *See* Dkt. No.

22   107-1, Ex. D at 10–11, 113–14; *id.*, Ex. G at 225–27, 233–36, 370–73.  Defendants do not suggest,

23   or offer any evidence, that some class members may have been told otherwise in these "daily"

24   individualized conversations with human resources.  Even now, Defendants consistently maintain

25   that the Atmel Plan expired in November 2015.  *See* Dkt. No. 108 at 6.  Even assuming there were

26   some individual differences in the conversations among class members about the Plan, the

27   Supreme Court has explained that "[i]ndividual differences should not bar a Rule 23(b)(1) or Rule

28   23(b)(2) class, so long as the Rule 23(a) threshold is met."  *Dukes*, 564 U.S. at 376.  The Court has

1    already found the requirements of Rule 23(a) to be met.  And if Plaintiffs succeed on their theory

2    of liability, the invalidity of any releases and the applicability of the Atmel Plan would apply

3    uniformly to all class members.[3]

4                          **b.  Relief for Breach of Fiduciary Duty:  Equitable Surcharge**

5                 Putting aside liability, Defendants also argue that Plaintiffs' request for equitable surcharge

6    renders the breach of fiduciary duty claim inappropriate for class certification under Rule

7    23(b)(1)(A).  Under ERISA § 502(a)(3), a plan participant or beneficiary may bring a civil action

8    "to obtain *other appropriate equitable relief* . . . to redress such violations."  29 U.S.C.

9    § 1132(a)(3)(B) (emphasis added).  Appropriate equitable relief under ERISA may include

10   surcharge.  *See Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 955–58 (9th Cir. 2014).  And

11   here, as part of their fiduciary duty claim, Plaintiffs seek several types of equitable relief,

12   including equitable surcharge.  *See* FAC at ¶¶ 82–97; *see also id.* at p.38 ("Prayer for Relief") at

13   ¶ 10.  During the hearing on the motion for class certification, Plaintiffs clarified that this theory of

14   surcharge is premised on the profit and benefit that Defendants received from use of the unpaid

15   benefits that should have been paid out.

16                 Defendants reason that this equitable surcharge constitutes monetary relief, which the

17   Ninth Circuit has held is "not appropriate" under Rule 23(b)(1)(A).  *See Zinser v. Accufix*

18   *Research Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001).  Defendants posit that even if multiple

19   courts were to calculate different surcharges for plaintiffs in different actions, that does not

20   preclude Defendants from abiding by such orders.  *See id.* at 1194 ("Rule 23(b)(1)(A) certification

21   requires more . . . than a risk that separate judgments would oblige the opposing party to pay

22   damages to some class members but not to others or to pay them different amounts . . . ."

23   (quotation omitted)).

24                 Plaintiffs respond that their request for equitable surcharge is only "incidental monetary

25   relief" for its breach of fiduciary duty claim, which does not preclude certification under Rule

26   23(b)(1)(A).  *See* Dkt. No. 110 at 7.  They suggest that they are primarily seeking injunctive relief

---

[3] Defendants raise the same argument in response to Plaintiffs' request for certification under Rule 23(b)(2), and the Court finds it similarly unavailing.

United States District Court
Northern District of California

1   to prevent Defendants from enforcing any releases and from denying their entitlement to

2   severance benefits.  *See* Dkt. No. 107 at 8, 12–14.  Plaintiffs further argue that there is a

3   significant risk that different courts would interpret Defendants' fiduciary obligations differently.

4   *Id.* at 12.  In support of their argument that any monetary surcharge is *de minimis*, Plaintiffs rely

5   heavily on the Ninth Circuit's opinion in *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th

6   Cir. 2011).  But *Ellis* was discussing the requirements for certifying a class under Rule 23(b)(2)

7   and offered no insight into whether—let alone under what circumstances—monetary relief may be

8   considered immaterial for purposes of certification under Rule 23(b)(1)(A).  *See id.* at 977, 987–88

9   (citing *Dukes*, 564 U.S. at 360).  And the Ninth Circuit acknowledged in *Ellis* that even under

10  Rule 23(b)(2), the Supreme Court has questioned the viability of evaluating whether monetary

11  relief is incidental to injunctive relief.  *See id.* at 986 (citing *Dukes*, 564 U.S. at 364–66).

12          Even assuming incidental monetary relief would not defeat class certification under Rule

13  23(b)(1)(A), Plaintiffs have not provided any support for their argument that the equitable

14  surcharge at issue here would only be incidental to the equitable relief requested.  During the

15  hearing on this motion Plaintiffs acknowledged that they have not done discovery as to

16  Defendants' use of the unpaid benefits under the Atmel Plan, and so could not specify what unjust

17  enrichment Defendants did or did not receive from any breach of fiduciary duty and what

18  equitable surcharge they would request as a result.  In *Wit*, the court found that the plaintiffs had

19  satisfied the requirements of  Rule 23(b)(1) despite the plaintiffs seeking an equitable surcharge as

20  part of their breach of fiduciary duty claim.  317 F.R.D. at 134.  Yet in finding that the surcharge

21  was incidental to the injunctive relief requested, the court noted that "it is significant that the

22  surcharge Plaintiffs seek is miniscule in comparison with the amount Plaintiffs may be able to

23  recover through the reprocessing of their denied claims."  *Id.*  There is simply no way for the

24  Court to evaluate on the record here whether the magnitude of any monetary relief from equitable

25  surcharge would eclipse any recovery from Plaintiffs' requested injunctive relief.  Plaintiffs must

26  meet their burden for class certification with evidentiary proof, and they have not proffered any.

27          Accordingly, on the record before it, the Court agrees that Plaintiffs' claim for equitable

28  surcharge defeats its request for certification under Rule(b)(1)(A).

United States District Court
Northern District of California

### ii.    Rule 23(b)(2)

Plaintiffs alternatively argue that certification of their breach of fiduciary duty claim is appropriate under Rule 23(b)(2).  "Rule 23(b)(2) applies only when a single injunction . . . would provide relief to each member of the class."  *Dukes*, 564 U.S. at 360.  The "key" to certifiability under Rule 23(b)(2) "is the indivisible nature of the injunctive or declaratory remedy warranted— the notion that the conduct is such that it can be enjoined . . . only as to *all* of the class members or as to *none* of them."  *Id.* (quotation omitted) (emphasis added).  The Ninth Circuit has previously held that "[c]lass certification under Rule 23(b)(2) is appropriate only where the *primary relief* sought is declaratory or injunctive."  *Zinser*, 253 F.3d at 1195 (quotation omitted) (emphasis added); *accord Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 860 (9th Cir. 2001) ("In Rule 23(b)(2) cases, monetary damage requests are generally allowable only if they are merely incidental to the litigation.").

Plaintiffs first contend that Rule 23(b)(2) certification is appropriate here because Defendants took the same core actions as to all class members, a single injunction would provide relief, and they seek predominately injunctive relief for breach of fiduciary duty.  *See* Dkt. No. 107 at 13–14.  But as with Plaintiffs' argument under Rule 23(a)(1)(A), they have not proffered any evidence that the equitable surcharge they seek is incidental monetary relief.  *See* Section III.B.i.

However, as noted above, the Supreme Court in *Dukes* has called into doubt whether this standard remains applicable for certification under Rule 23(b)(2).  *See Ellis*, 657 F.3d at 986 (citing *Dukes*, 564 U.S. at 364–66).  The Supreme Court raised concerns about requests for any monetary relief on behalf of Rule 23(b)(1) and 23(b)(2) classes given the diminished procedural protections these provisions offer absent class members.  *Dukes*, 564 U.S. at 361–62.  Such classes are mandatory and class members are not required to receive notice.  *Id.*  For now, however, the Supreme Court has left open whether certification under Rule 23(b)(2) "applies only to requests for [] injunctive or declaratory relief and does not authorize the class certification of monetary claims at all."  *Dukes*, 564 U.S. at 360.  Following *Dukes*, the Ninth Circuit explained that "[i]nstead of considering the amount of the damages sought . . . to determine if injunctive relief 'predominates,' the relevant inquiry is what procedural safeguards are required by the due process

1    Clause for the type of relief sought." *Ellis*, 657 F.3d at 986–87.  As the Supreme Court

2    emphasized in *Dukes*, due process does not authorize class certification under Rule 23(b)(2) where

3    a claim requires "an *individualized* award of monetary damages."  *Id.* at 360–61 (emphasis added).

4         Plaintiffs respond that their request for equitable surcharge does not constitute

5    individualized monetary relief.  *See Dukes*, 564 U.S. at 360–61.  Plaintiffs explain that under their

6    theory, both the harm and injury are the same for all class members, because their claim is based

7    on Defendants' breach of fiduciary duty and resulting unjust enrichment.  Under ERISA, a

8    surcharge is intended as "'compensation' for a loss resulting from a trustee's breach of duty, or to

9    prevent the trustee's unjust enrichment." *Gabriel*, 773 F.3d at 957 (quoting *Cigna Corp. v.*

10   *Amara*, 563 U.S. 421, 441–42 (2011)).  Accordingly, "to obtain relief by surcharge for a breach of

11   the ERISA trustee's duties, a plan participant or beneficiary must show that the violation injured

12   him or her, but need only show harm and causation, not detrimental reliance."  *Id.* at 957–58

13   (quotation omitted).  The Supreme Court has further clarified that a surcharge requires "a showing

14   of actual harm—proved (under the default rule for civil cases) by a preponderance of the

15   evidence." *Cigna*, 563 at 444.

16        Plaintiffs argue that such actual harm may "come from the loss of a right protected by

17   ERISA" or even the confusion engendered by a fiduciary's "failure to provide proper summary

18   information . . . even if [beneficiaries] did not themselves act in reliance on" that information.  *See*

19   *id.*  And under Plaintiffs' legal theory, because Plaintiffs were subjected to the same, erroneous

20   information about the expiration and enforceability of the Atmel Plan, they were all harmed in the

21   same way.  *See* FAC at ¶¶ 85–92.  As to damages, Plaintiffs disavow a claim for equitable

22   surcharge calculated based on Plaintiffs' individual harm.  *See, e.g.*, Dkt. No. 110 at 11–12.

23   Instead, Plaintiffs state that the question is what benefit Defendants received from their use of the

24   unpaid benefits, distributed equally to class members.

25        Defendants respond that equitable surcharge will require "individual determinations . . .

26   with respect to whether each putative class member experienced actual harm in excess of the

27   denial of their benefits, and what amount of surcharge would be appropriate to compensate each

28   individual's actual harm, if any." *See* Dkt. No. 108 at 19.  But as noted above, Plaintiffs' theory is

United States District Court
Northern District of California

20

1    not about class members' actual damages above and beyond their loss of benefits.  Rather, a

2    "trustee (or a fiduciary) who gains a benefit by breaching his or her duty must return that benefit to

3    the beneficiary."  *See Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir.

4    2012) (finding for purposes of summary judgment that the plaintiffs had not presented any

5    evidence that the defendant gained a benefit); *cf.* Restatement (Third) of Restitution and Unjust

6    Enrichment § 51 (2011) ("The profit for which the wrongdoer is liable . . . is the net increase in the

7    assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong.").

8    Plaintiffs acknowledge that they have not yet presented evidence of what benefit Defendants

9    received by breaching their fiduciary duty, but in any event, it is based on common proof rather

10   than individualized damage calculations.  Whether Plaintiffs' fiduciary duty claim will ultimately

11   succeed and whether surcharge will be an appropriate remedy under the circumstances of this case

12   remains to be seen.  But at this stage, the Court is not tasked with evaluating the likelihood of

13   Plaintiffs' success on the merits of their fiduciary duty claim or request for equitable surcharge.

14       The Court therefore finds that class certification of Plaintiffs' fiduciary duty claim is

15   appropriate under Rule 23(b)(2).

16       ### iii.    Rule 23(b)(3)

17       Plaintiffs also ask the Court to certify both the fiduciary duty claim and the improper

18   denial of benefits claim under Rule 23(b)(3).  *See* Dkt. No. 107 at 11.  Rule 23(b)(3) requires that

19   "the questions of law or fact common to class members predominate over any questions affecting

20   only individual members, and that a class action is superior to other available methods for fairly

21   and efficiently adjudicating the controversy."  Fed. R. Civ. P (23)(b)(3).

22       #### a.    Predominance

23       The predominance inquiry tests whether proposed classes are sufficiently cohesive to

24   warrant adjudication by representation."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045

25   (2016) (quotation omitted).  The Supreme Court has defined an individual question as "one where

26   members of a proposed class will need to present evidence that varies from member to member,

27   while a common question is one where the same evidence will suffice for each member to make a

28   prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Id.* (quotation

United States District Court
Northern District of California

1    omitted).  This "inquiry asks whether the common, aggregation-enabling, issues in the case are

2    more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.*

3    (quotation omitted).

4          With respect to the monetary relief sought by a putative class, predominance requires that

5    "damages are capable of measurement on a classwide basis, in the sense that the whole class

6    suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal

7    theory." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017) (quoting *Comcast Corp. v.*

8    *Behrend*, 569 U.S. 27, 34 (2013)) (internal quotation marks omitted).  As such, "a model

9    purporting to serve as evidence of damages in [a] class action must measure only those damages

10   attributable" to the relevant theory of liability.  *Comcast*, 569 U.S. at 35.  While a proffered model

11   "need not be exact" at the class certification stage, it "must be consistent with [the plaintiff's]

12   liability case."  *Id.* (quotation omitted); *see also Cal. v. Infineon Techs. AG*, No. C 06-4333 PJH,

13   2008 WL 4155665, at \*9 (N.D. Cal. Sept. 5, 2008) (stating that at class certification stage, court's

14   role is to "discern only whether plaintiffs have advanced a plausible methodology to demonstrate

15   that . . . injury can be proven on a class-wide basis").  Moreover, while predominance is not shown

16   where "[q]uestions of individual damage calculations . . . inevitably overwhelm questions

17   common to the class," *Comcast*, 569 U.S. at 34, the "presence of individualized damages" on its

18   own is insufficient to defeat class certification, *Just Film*, 847 F.3d at 1120 (quoting *Leyva v.*

19   *Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).

20                          **1.   Denial of Benefits**

21         Plaintiffs argue that their eligibility for benefits under the Atmel Plan can be determined in

22   a single adjudication because their entitlement to benefits turns on the same interpretation of the

23   Atmel Plan and whether the Dialog merger agreement constituted an "Initial Triggering Event"

24   under the plain meaning of the Plan.  *See* Dkt. No. 107 at 16.  And once liability is established,

25   Plaintiffs argue that the amount of benefits due can be easily determined.  *Id.* at 16–17.  They

26   reason that under the Atmel Plan, terminated employees were entitled to a certain percentage of

27   their base salary; health insurance premiums; and a prorated portion of their annual incentive

28   bonus.  The signed releases offered just 50% of these benefits, so calculating what more they are

owed will be simple:  it is equal to the amount Defendants already paid them.  *See id.* at 17.

Defendants do not appear to challenge whether Plaintiffs have provided a model for payment of benefits.  Rather, Defendants respond that resolving whether liability is established for the denial of benefits in the first instance will require consideration of each of the individual releases signed by class members.  *See* Dkt. No. 108 at 20.  Defendants urge that the releases are valid and cover nearly all the putative class members.  *See id.*  The Court understands Defendants' position that these releases are valid and preclude a finding of liability as to almost all class members.  The existence of these releases, however, does not appear to be contested by Plaintiffs.  In fact, they have proffered them here as part of the class certification motion.  *See* Dkt. No. 107-2, Ex. H at 13–1341.  But critically, Plaintiffs' response to this asserted defense does not require individualized determinations.  Contrary to Defendants' framing that each individual release will need to be evaluated to determine if it was obtained by individual "threats, coercion and intimidation," *see* Dkt. No. 108 at 20, Plaintiffs' argument that the releases are invalid is based on class-wide communications that misrepresented the terms of the Atmel Plan.  The Court finds that common issues therefore predominate as to Plaintiffs' denial of benefits claim.

### 2.   Breach of Fiduciary Duty

Plaintiffs next explain that common questions predominate for purposes of their breach of fiduciary duty claim because Defendants' liability turns on whether Microchip was a fiduciary and whether it accurately informed Plaintiffs of their ERISA rights under the Atmel Plan, or instead misled them about its enforceability.  *See* Dkt. No. 107 at 15.  As already noted, Plaintiffs' theory is premised on Defendants' representations—including at the all-hands meeting—that the Atmel Plan had expired.  Defendants' position was consistent, even when seeking releases from Atmel employees.  Despite asserting throughout its brief that there were no uniform statements from Defendants about the Atmel Plan, Defendants proffer no evidence to suggest otherwise, and in their brief still maintain that the Atmel Plan expired before any Change of Control.  Based on Defendants' alleged misrepresentations about the expiration of the Plan, Plaintiffs seek to enjoin Defendants from enforcing the releases; estop them from denying payment of benefits; and require them to disgorge any profits as an equitable surcharge.  Defendants' appear to question whether

1   Plaintiffs will succeed in proving the invalidity of the releases and their interpretation of the Atmel

2   Plan, but Plaintiffs do not need to prove their case at the class certification stage.

3          To the extent Defendants suggest that liability may turn on whether the plan administrator

4   could rely on the releases that the class members signed, the Court notes that the plan

5   administrator did not base its determination of denial of benefits on the releases, but instead said

6   that they were "not relevant." *See, e.g.*, Dkt. No. 107-1, Ex. D at 76–78, 102–05.  And to the

7   extent Defendants simply repeat their arguments that determining the surcharge owed to each class

8   member will require individualized assessments, the Court has already explained in Section

9   III.B.ii. above that no such individualized assessment is warranted under Plaintiffs' disgorgement

10   theory.  Furthermore, the "presence of individualized damages" on its own is insufficient to defeat

11   class certification.  *Just Film*, 847 F.3d at 1120.  The Court finds that common issues therefore

12   predominate as to Plaintiffs' breach of fiduciary duty claim as well.

13                              **b.  Superiority**

14          Lastly, the Court considers whether "a class action is superior to other available methods

15   for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In doing so, the

16   Court considers four non-exclusive factors:  (1) the interest of each class member in individually

17   controlling the prosecution or defense of separate actions; (2) the extent and nature of any

18   litigation concerning the controversy already commenced by or against the class; (3) the

19   desirability of concentrating the litigation of the claims in the particular forum; and (4) the

20   difficulties likely to be encountered in the management of a class action.  *Id.*  "Where classwide

21   litigation of common issues will reduce litigation costs and promote greater efficiency, a class

22   action may be superior to other methods of litigation."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d.

23   1227, 1234–35 (9th Cir. 1996).

24          Here, Plaintiffs contend that a class action is superior because pursuing individual actions

25   would be cost-prohibitive, this is the proper forum, and resolving liability and determining

26   individualized damages will be manageable as discussed in the predominance discussion above.

27   *See* Dkt. No. 107 at 17–18.  Rather than respond to these individual arguments, Defendants again

28   emphasize that their defense to liability will turn on the releases, and this action will require 200

United States District Court
Northern District of California

mini-trials into the validity of these releases.  The Court disagrees, and reiterates that Defendants'
concern is based on the faulty premise that Plaintiffs have no evidence that Defendants made any
common communications to induce class members into signing these releases.  Defendants may
contest the nature of these communications and the weight of Plaintiffs' evidence even on a
classwide basis.

*     *     *

The Court finds that certification under Rule 23(b)(3) is appropriate as to Plaintiffs' claim
for denial of benefits.  Having already found that class certification is appropriate under Rule
23(b)(2) for Plaintiffs' claim for breach of fiduciary duty, the Court finds in the alternative that
certification is also appropriate under Rule 23(b)(3).

## IV.    CONCLUSION

Accordingly, the Court **GRANTS** the motion for class certification.  The Court further
**SETS** a further case management conference for March 17, 2020, at 2:00 p.m.  The parties are
**DIRECTED** to meet and confer and submit a joint case management statement by March 10,
2020.  The joint statement should include a proposed schedule through trial.

**IT IS SO ORDERED.**

Dated:  2/24/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge