UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PETER SCHUMAN, et al.,

           Plaintiffs,

    v.

MICROCHIP TECHNOLOGY INCORPORATED, et al.,

           Defendants.

Case No. 16-cv-05544-HSG

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 163

Pending before the Court is the motion for summary judgment filed by Defendants Microchip Technology, Inc., Atmel Corporation, and Atmel Corporation U.S. Severance Guarantee Benefit Program.  Dkt. No. 163.  The motion was held in abeyance while the case was stayed, and the parties completed the briefing and the Court heard argument once the stay was lifted.  For the reasons detailed below, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

## I.  BACKGROUND

### A.  Factual Background

The parties are familiar with the facts of this case, and many remain undisputed.  Plaintiffs are a certified class of 220 former employees of Defendant Atmel Corporation.[1]  *See* Dkt. No. 122 (order granting class certification); *see also* Dkt. 107 at 6, n.4; Dkt. 134 at 14, n.7.  In July 2015, Atmel created the U.S. Severance Guarantee Benefit Program ("Plan" or "Atmel Plan").  *See Berman v. Microchip Technology Inc.*, Case No. 17-cv-01864-HSG, Dkt. No. 157 at 4115–19.  The cover letter distributed with the Plan said that Atmel recognized there "ha[d] been significant

[1] The nine plaintiffs in the related action, *Berman v. Microchip Technology Inc.*, Case No. 17-cv-01864-HSG, did not sign any release agreements, and the parties settled that case in April 2023.

market speculation regarding possible transactions involving the company," and that "such rumors can be distracting and unsettling." *Id.* at 4117. The letter further explained that the Plan was "intended to ease concerns among [] employees" and allow them to "focus[] on [the company's] continued success." *See id.*

      The relevant terms of the Plan are as follows:

> **Term of the Severance Guarantee Benefit Program:**  The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

> **Eligibility:**  Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

> **Initial Triggering Event:**  Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company.  If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

> **Benefits Conditions:**  After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

>    (A) A Change of Control actually occurs; and

>    (B) Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

> For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

*Id.* at 4115. The Plan further states that Atmel's successor would "assume the obligations" of the Plan. *Id.* at 4116. The Plan therefore created three conditions precedent to Plaintiffs' entitlement to severance benefits: (1) an Initial Triggering Event occurred before November 1, 2015; (2) a Change of Control actually occurred; and (3) Plaintiffs were terminated without cause. *Id.* at

2

United States District Court
Northern District of California

4115.  The parties in both *Berman* and *Schuman* disputed whether the first condition was met because the eventual "Change of Control" did not involve the same company that entered into a "Definitive Agreement with Atmel before November 1, 2015."

In September 2015, Atmel entered into an agreement with Dialog Semiconductor, under which Dialog would acquire Atmel.  *See* Dkt. No. 152 at 2202–48.  However, before the merger with Dialog closed, Atmel received a competing offer from Defendant Microchip Technology Inc.  *See id.* at 2250–51.  During this time, Atmel's then-Senior Vice President of Global Human Resources, Suzy Zoumaras, sent a letter to employees—including the named Plaintiffs in this case—stating that the Atmel Plan "continues to remain in place."  *See Berman*, Dkt. No. 152 at 419; *see also* Dkt. No. 176-1, Ex. B at 25:1–27:24.  The letter further reminded employees of the benefits they may be eligible for if terminated following "an acquisition by Dialog or Microchip."  *See id.*; *see also* Dkt. No. 176-1, Ex. C at 24:2–16 (Atmel CEO Steve Laub explaining that he communicated to employees "their severance agreements would be effective if Microchip turned out to be the acquirer").  Ultimately, Dialog did not make a new offer, and Atmel entered into a new agreement with Microchip in January 2016.  *See* Dkt. No. 29 at ¶ 36.  In February 2016, Atmel's Human Resources Department circulated a "Frequently Asked Questions" document to employees regarding "compensation & benefits relating to the Microchip merger."  Dkt. No. 176-2, Ex. S at 421–22.  The document stated that "Microchip has agreed to honor each of your employment and compensatory contracts agreements"—including severance agreements—"*that are in effect immediately prior to the closing of the transaction*."  *Id.* (emphasis added).  Employees continued to raise concerns about the applicability of the Atmel Plan to the Microchip merger.  *See, e.g.*, Dkt. No. 163-1, Ex. 2 at ¶ 13; Dkt. No. 163-1, Ex. 3 at ¶¶ 11–12; Dkt. No. 163-1, Ex. 4 at ¶¶ 8–20.  The merger between Atmel and Microchip ultimately closed in April 2016.  *See* Dkt. No. 29 at ¶ 36.

Following the merger, Microchip's CEO—and the new CEO of Atmel—Steve Sanghi held an "all-hands" meeting for Atmel employees, during which he explained that the Atmel Plan had expired and Microchip would not honor its terms.  *See* Dkt. No. 176-1, Ex. E at 65:24–77:20.  He also had a PowerPoint presentation explaining Microchip's interpretation of the Plan.  *Id.* at

67:17–23.  According to William Coplin, one of the named Plaintiffs, Mr. Sanghi asserted that "Atmel employees would have to fight him in court if they wanted to challenge him on their entitlement to benefits under the [Atmel] Plan."  *See* Dkt. No. 176-1, Ex. R at 256–57.  Mr. Sanghi also explained that Microchip was nevertheless willing to offer terminated Atmel employees 50 percent of the benefits provided by the Atmel Plan in exchange for signing a release of any claims under the original Atmel Plan.  *See* Dkt. No. 176-1, Ex. E at 65:24–77:20.

Plaintiffs in this case were terminated without cause following the merger with Microchip and offered reduced severance benefits.  *See, e.g.*, Dkt. No. 163-1, Ex. R to Ex. 1 at 815–820.  As relevant to this case and Defendants' motion for summary judgment, 215 of the 220 Plaintiffs signed a release in exchange for a portion of the severance benefits provided for by the Atmel Plan.[2]  *See, e.g.*, Dkt. No. 176-2, Ex. R at 410–13.  The cover letter to the offer explained that "[t]he Company and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by the Company . . . ."  *See* Dkt. No. 163-1, Ex. R to Ex. 1 at 815.  The letter further states that the agreement "supersedes any other actual or perceived promises, warranties, or representations . . . including, for the avoidance of doubt, any programs, policies, or agreements with respect to severance or equity acceleration benefits made prior to April 4, 2016."  *Id.* at 816.

The release itself states in relevant part:

> You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability related to or arising out of your employment with any of them. *This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not.* This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

United States District Court
Northern District of California

---

[2] Five class members in this case, like those in the *Berman* case, did not sign a release.  *See* Dkt. No. 176 at 1; *see also* Dkt. 107 at 6, n.4.

4

*See id.* at 818 (emphasis added).

Despite signing these releases, named Plaintiffs Peter Schuman and William Coplin filed this class action in September 2016.  *See* Dkt. No. 1.  The parties then agreed to give Plaintiffs an opportunity to exhaust ERISA's administrative claims process and to file an amended complaint. *See* Dkt. No. 27.  Plaintiffs accordingly submitted claims for severance benefits under the Atmel Plan, and the plan administrator denied their claims.  *See* Dkt. No. 176-1, Ex. R at 600–03, 1900– 03.  The denial letters stated that Plaintiffs were "not eligible for benefits under the Atmel Severance Plan" because the Plan had "automatically expired on November 1, 2015."  *Id.*  The letters further acknowledged Plaintiffs' requests for recission of the releases, but the plan administrator concluded that Plaintiffs had not supported the request, and in any event, because Plaintiffs were "not eligible for benefits under the Atmel Severance Plan," the releases were "not relevant" to their claims for benefits.  *Id.*  Plaintiffs' administrative appeals were also denied.  *See* Dkt. No. 176-2, Ex. V at 117–19, 135–37.  Again, the letters explained that Plaintiffs were "not eligible for benefits under the Atmel Severance Plan" because it had expired.  *Id.*

Plaintiffs then filed an amended complaint in this case.  *See* Dkt. No. 29 ("FAC").

### B.    Procedural History

In the FAC, Plaintiffs alleged that Defendants (1) breached their fiduciary duties by misinterpreting the severance agreements as having expired and encouraging Plaintiffs to sign releases in exchange for reduced severance benefits, in violation of ERISA § 404(a), 29 U.S.C. § 1104(a); (2) improperly denied their claims for benefits, in violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); and (3) interfered with their right to recover benefits payments, in violation of ERISA § 510, 29 U.S.C. § 1140.  *See id.* at ¶¶ 82–111.  In addition to benefits under the Atmel Plan, Plaintiffs also sought several forms of equitable relief based on the alleged breach of fiduciary duty.  *See id.* at ¶¶ 93–97.  In February 2018, the Court granted in part and denied in part Defendants' motion to dismiss, narrowing the scope of the case.  *See* Dkt. No. 54.  The Court dismissed Plaintiffs' third cause of action for interference with claim benefits, and also dismissed several of the forms of equitable relief that Plaintiffs sought as duplicative of their claim for benefits under the Atmel Plan.  *Id.* at 16–25.  And as relevant to Defendants' argument regarding

the enforceability of the releases that Plaintiffs signed in this case, *see* Section III.A below, the Court interpreted Plaintiffs' request to void the releases as a claim for recission. *See id.* at 22–24. However, the Court dismissed the recission claim because Plaintiffs failed to allege that they offered to tender the partial severance benefits that they received by signing the releases. *Id.*

The operative complaint thus contains claims for (1) breach of fiduciary duty and (2) denial of claim benefits. Plaintiffs also seek injunctive relief preventing Microchip from enforcing the releases it obtained and from soliciting new releases. *See* FAC at ¶¶ 93–97; *see also* 176 at 3 ("[T]he appropriate equitable remedy . . . is an order enjoining the enforcement of Microchip's wrongfully obtained releases . . . .").

In response to the FAC, Defendants filed a counterclaim for equitable relief under ERISA § 502(a)(3) to enjoin Plaintiffs from dissipating benefits received and estopping them from pursuing their claims in this case. *See* Dkt. No. 59. In March 2019, the Court granted Plaintiffs' motion to dismiss Defendants' counterclaim. *See* Dkt. No. 103. The Court explained that regardless of the effect that any release may eventually have on the merits of Plaintiffs' case, "it is not a covenant not to sue." *See id.* at 6. Defendants therefore had not established that Plaintiffs violated the terms of an ERISA plan. *Id.* The Court subsequently granted Plaintiffs' motion for class certification, Dkt. No. 122, and the parties moved for summary judgment.

At the same time, the parties continued to litigate the related *Berman* case, and eventually agreed to stay this case pending resolution of the *Berman* trial. *See* Dkt. No. 169. As relevant here, the Court granted the *Berman* plaintiffs' motion for partial summary judgment and denied Defendants' Rule 56(d) request for discovery. *See Berman*, Dkt. No. 95. At the time, the Court found that under the plain language of the Atmel Plan, it had not expired in November 2015 and the *Berman* plaintiffs were entitled to severance benefits. *Id.* The Court further reasoned that as a consequence of this plain meaning, the plan administrator breached its fiduciary duties by misrepresenting the Plan terms and denying benefits. *Id.* On appeal, the Ninth Circuit reversed in part, concluding that the pertinent plan language was "ambiguous" and that discovery was therefore warranted. *See Berman v. Microchip Tech. Inc.*, 838 F. App'x 292, 293 (9th Cir. 2021).

On remand, the Court denied the *Berman* parties' cross-motions for summary judgment

1    and the case was set for trial.  However, the parties settled before the trial.  The Court accordingly

2    lifted the stay in this case, Dkt. No. 172, and Defendants renewed their prior motion for summary

3    judgment, *see* Dkt. Nos. 163, 173.

4    **II.    LEGAL STANDARD**

5           Summary judgment is proper when a "movant shows that there is no genuine dispute as to

6    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

7    A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*

8    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is evidence

9    in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*

10   But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from

11   the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec.*

12   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence

13   or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997),

14   *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).  If a court

15   finds that there is no genuine dispute of material fact as to only a single claim or defense or as to

16   part of a claim or defense, it may enter partial summary judgment.  Fed. R. Civ. P. 56(a).

17   **III.   DISCUSSION**

18          *First*, Defendants contend that almost all Plaintiffs in this case signed valid releases that

19   bar their claims for benefits under the Atmel Plan.  Dkt. No. 163 at 7–14.  *Second*, Defendants

20   contend that Plaintiffs' breach of fiduciary duty claim and their related requests for equitable relief

21   fail.  *See id.* at 14–25.  *Lastly*, Defendants preserve their argument that Plaintiffs' denial of

22   benefits claim also fails.  *Id.* at 7, n.1.

23          **A.    Releases**

24          As an initial matter, Defendants argue that Plaintiffs knowingly and voluntarily waived

25   their right to pursue claims under the Atmel Plan.[3]  *See* Dkt. No. 163 at 7–14.  Plaintiffs respond

26   that Defendants waived the right to rely on these releases, and in any event, they are not

27   _____

28   [3] For purposes of this section, when referring to "Plaintiffs" the Court only refers to the 215 of the
     220 class members who signed releases in exchange for partial severance benefits.

1    enforceable given the unique context of this case.  *See* Dkt. No. 176 at 12–15.

2            **i.**    **Waiver**

3          Plaintiffs do not appear to dispute that if the releases were valid and enforceable they

4    would bar Plaintiffs' claims in this case.  *See* Dkt. No. 176 at 3 ("[T]he appropriate equitable

5    remedy . . . is an order enjoining the enforcement of Microchip's wrongfully obtained releases,

6    thus entitling plaintiffs and class to their long-unpaid severance amounts under the Plan.").

7    Instead, Plaintiffs first urge that Defendants waived any right to rely on the releases.  *See id.* at 12–

8    14.

9          Plaintiffs argue that Defendants cannot rely on the releases to bar their right to pursue their

10    claims in this case because the plan administrator did not base the denial of claims on the

11    existence of these releases.  *Id.*  Rather, the denial letters simply stated that the Atmel Plan had

12    expired.  *See* Dkt. No. 176-1, Ex. R at 600–03, 1900–03.  To the extent the letters referenced the

13    releases at all, they said they were "not relevant."  *Id.*  Plaintiffs point out that the Ninth Circuit

14    has held that "a court will not allow an ERISA plan administrator to assert a reason for denial of

15    benefits that it had not given during the administrative process."  *Harlick v. Blue Shield of*

16    *California*, 686 F.3d 699, 719–20 (9th Cir. 2012).

17          In *Harlick*, the plaintiff had sought coverage for treatment for anorexia nervosa.  *See id.* at

18    703–04.  The defendant denied her claim, concluding that the plaintiff's treatment was at a

19    residential facility, which was not covered under the plan.  *Id.* at 705–06.  The Ninth Circuit

20    concluded that the California Mental Health Parity Act required coverage of all "medically

21    necessary treatment for severe mental illness," and proceeded to consider whether the plaintiff's

22    stay at the facility was medically necessary.  *Id.* at 719.  The claim administrator had not denied

23    the claim based on a failure to show that the treatment was medically necessary.  *Id.* at 719–20.

24    The Ninth Circuit rejected the defendant's attempt to raise this argument for the first time on

25    appeal, holding that "a court will not allow an ERISA plan administrator to assert a reason for

26    denial of benefits that it had not given during the administrative process."  *Id.*

27         The Court explained that ERISA and its implementing regulations require that "[a]n

28    ERISA plan administrator who denies a claim [ ] explain the 'specific reasons for such denial' and

United States District Court
Northern District of California

1     provide a 'full and fair review' of the denial." *Id.* at 719 (quoting 29 U.S.C. § 1133). This is

2     designed to allow claimants the ability to prepare for administrative review and appeal to the

3     federal courts, and to prevent them from being "'sandbagged' by a rationale the plan administrator

4     adduces only after the suit has commenced." *Id.* at 720 (quotation omitted); *see also Jebian v.*

5     *Hewlett–Packard Co. Emple. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1104 (9th Cir.

6     2003) (explaining that this rule "parallels the general rule that an agency's order must be upheld, if

7     at all, on the same basis articulated in the order by the agency itself, not a subsequent rationale

8     articulated by counsel.") (quotation omitted).

9          Because the plan administrator here did not base the denial of Plaintiffs' claims on the

10    existence of the releases, Plaintiffs contend that Defendants waived the ability to rely on them as a

11    defense in this case. *See* Dkt. No. 176 at 12–14. The Court is not persuaded. Unlike in *Harlick*,

12    the Court is not considering the releases as part of the merits of Plaintiffs' claims, but rather as an

13    affirmative defense to determine whether they can pursue their ERISA claims at all. Several

14    courts in this district have addressed this same set of circumstances and concluded that "a right to

15    ERISA benefits and a right to bring an ERISA action in federal court are distinct." *Gonda v. The*

16    *Permanente Med. Grp., Inc.*, No. 11-CV-01363-SC, 2015 WL 678969, at *4 (N.D. Cal. Feb. 17,

17    2015), *aff'd sub nom. Gonda v. Permanente Med. Grp., Inc.*, 691 F. App'x 397 (9th Cir. 2017)

18    (collecting cases); *see also Upadhyay v. Aetna Life Ins. Co.*, No. C 13-1368 SI, 2014 WL 186709,

19    at *2 (N.D. Cal. Jan. 16, 2014), *aff'd*, 645 F. App'x 569 (9th Cir. 2016); *Parisi v. Kaiser Found.*

20    *Health Plan Long Term Disability Plan*, No. C 06-04359 JSW, 2008 WL 220101, at *3 (N.D. Cal.

21    Jan. 25, 2008).

22         Plaintiffs attempt to distinguish these cases by suggesting that Defendants may only raise

23    the releases as an affirmative defense if the claim administrator was unaware at the time it

24    evaluated the claims that the releases existed. *See* Dkt. No. 176 at 13–14. Because Plaintiffs

25    challenged the validity of the releases when they submitted claims for benefits under the Atmel

26    Plan, *see* Dkt. No. 176-1, Ex. R at 600–03, 1900–03, Plaintiffs point out that the claim

27    administrator here was aware of—and could have relied on—the releases when denying their

28    claims. She did not, and instead simply explained that Plaintiffs were "not eligible" because the

*United States District Court*
*Northern District of California*

Atmel Plan had expired.  Dkt. No. 176-2, Ex. V at 117–19, 135–37.  But as Defendants point out, none of the cases identified above turned on whether the plan administrator was aware of the releases.  To the contrary, in *Parisi*, the court acknowledged that the administrator was "fully aware" of the release but did not use it as a reason to deny benefits.  *See* 2008 WL 220101, at *1, n.1.  These cases turned on the idea that there is a meaningful distinction between consideration of the merits of a plaintiff's claim for benefits and his or her right to bring an ERISA action in federal court.  Plaintiffs fail to grapple with this distinction at all.

    The Court finds the reasoning of these cases persuasive and adopts it here.  In considering the releases in this case, the Court is neither opening up the administrative record nor reviewing Defendants' denial of Plaintiffs' benefits claims.  The Court is simply being asked to consider whether the releases bar Plaintiffs' ERISA action in the first instance.  And here, the broad language of the releases is clear, and if enforceable, would preclude an ERISA action in federal court.  Under the releases, Plaintiffs agree "to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from *any liability* related to or arising out of [Plaintiffs'] employment with any of them. *This includes a release of any liability for claims of any kind that you ever had or may have at this time*, whether you know about them or not."  *See* Dkt. No. 163-1, Ex. R to Ex. 1 at 818 (emphasis added).  The accompanying offer letter further explained that Defendants were offering benefits in exchange for releases "to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by the Company . . . ."  See Dkt. No. 163-1, Ex. R to Ex. 1 at 815.

    Plaintiffs briefly suggest that the plan administrator had authority to waive the releases, and thus did so by failing to rely on them during the administrative process.  *See* Dkt. No. 176 at 13–14.  But the only two cases that Plaintiffs cite are inapposite.  In *Barron v. UNUM Life Insurance Co. of America*, the Fourth Circuit rejected a claim administrator's attempt to deny the plaintiff benefits based on a general release that she had signed when she worked for a different employer and had coverage under a different employee benefits plan.  260 F.3d 310, 313–16 (4th Cir. 2001).  The defendant had attempted to argue that the release, entered into with UNUM Life Insurance, covered not only the earlier UNUM policy, but any other future UNUM policy

regardless of the policyholder.  *Id.* at 313–14.  The court rejected this interpretation, finding no support for it in the language of the policy, and concluding that the defendant was improperly trying to reduce its own insurance risk.  *Id.* at 315–16.  And in *Jacobs v. Xerox Corp. Long Term Disability Income Plan*, the district court simply stated in a footnote that the claim administrator had an "alternative basis" for denying the plaintiff's claim based on a general release.  356 F. Supp. 2d 877, 891, n.12 (N.D. Ill. 2005).  Neither case addressed whether a plan administrator can waive the company's right to assert a release as an affirmative defense in court if the administrator does not rely on it during the administrative process.  Plaintiffs have not offered any on-point support for their contention that Defendants waived the right to rely on the releases in this case.

The Court finds that Defendants may raise their waiver defense in this case even though the releases were not relied upon during the administrative process.  The Court therefore considers whether the releases are enforceable.

### ii.    Enforceability

"A release is the abandonment, relinquishment or giving up of a right or claim to the person against whom it might have been demanded or enforced . . . and its effect is to extinguish the cause of action; hence it may be pleaded as a defense to the action."  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1017, n.10 (9th Cir. 2012) (quotation omitted).  In other words, a release is "the act of giving up a right or claim to the person against whom it could have been enforced."  *Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1084 (9th Cir. 2007) (quoting Release, Black's Law Dictionary (abridged 7th ed. 2000)).  The parties appear to agree that in the context of ERISA, releases must be evaluated under a "heightened scrutiny" standard.  *See* Dkt. No. 176 at 14–15; Dkt. No. 177 at 3–4; *see also Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1012 (9th Cir. 1997) (noting that in the context of ERISA, releases "must withstand special scrutiny designed to prevent potential employer or fiduciary abuse").

Courts therefore consider whether the release was "'knowing and voluntary' by examining the totality of the circumstances."  *See Rombeiro v. Unum Ins. Co. of Am.*, 761 F. Supp. 2d 862, 868–69 (N.D. Cal. 2010) (collecting cases).  Relevant factors include:

11

> (1) plaintiff's education and business sophistication; (2) the respective roles of employer and employee in determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver.

*Id.* (quotation omitted); *accord Gonda*, 2015 WL 678969, at *3 (applying same six-factor test as developed in *Finz v. Schlesinger*, 957 F.2d 78, 82 (2d Cir.1992)); *Upadhyay*, 2014 WL 186709, at *4 (same); *Parisi*, 2008 WL 220101, at *4 (same).

Plaintiffs do not address these factors at all, urging that this analysis is somehow improper under the specific circumstances of this case. Dkt. No. 176 at 14–15. Plaintiffs contend that whether the releases were knowingly and voluntarily obtained is simply irrelevant where, as alleged here, "Microchip violated its fiduciary duties by the very act of obtaining releases in exchange for sharply reduced severance payments." Dkt. No. 176 at 14 (emphasis omitted). In the FAC and in their opposition brief, Plaintiffs allege that Defendants breached their fiduciary duties in multiple ways, including by failing to provide complete information about the benefits to which Plaintiffs were entitled, failing to investigate the intended meaning of the Atmel Plan, and offering Plaintiffs reduced severance benefits in exchange for releases. *See* FAC at ¶¶ 87–89; *see also* Dkt. No. 176 at 2–3, 18–22. In other words, Defendants misinterpreted and misled Plaintiffs about the meaning of the Atmel Plan. During the hearing on the motion, Plaintiffs reiterated their position that a review of the totality of the circumstances or use of the six-factor test to evaluate the releases is inappropriate in light of these alleged breaches. In short, Plaintiffs suggest that releases are never enforceable in cases where, as here, the plaintiffs allege that the defendant breached its fiduciary duty by even seeking them.

Yet Plaintiffs offer no authority for this contention. Although emphasizing that waivers of ERISA rights are subject to heightened scrutiny and citing some of the same cases referenced above, Dkt. No. 176 at 14, Plaintiffs state that these cases are somehow meaningfully different from this one. Plaintiffs point out that the releases in these other cases were "the product of legitimate negotiations following a good-faith employment dispute *unrelated* to any dispute about ERISA benefits." *See* Dkt. No. 176 at 15 (emphasis in original). None of these cases, however, conditioned application of the six-factor test in this way. To the contrary, in each case the court

United States District Court
Northern District of California

evaluated the totality of the circumstances, including the nature of the negotiations.  *See Rombeiro*, 761 F. Supp. 2d at 868–69 (considering "the respective roles of employer and employee in determining the provisions of the waiver").

Plaintiffs also briefly cite 29 U.S.C. § 1110(a), which provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."  *See* Dkt. No. 176 at 14; *see also IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1418 (9th Cir. 1997).  Yet courts have routinely explained that § 1110 does not preclude individuals from entering into agreements that settle or release breach of fiduciary duty claims.  *See, e.g.*, *Upadhyay*, 2014 WL 186709, at *3 ("[C]ourts have uniformly permitted 'knowing and voluntary' private releases of statutory claims.") (collecting cases).

Here, Defendants offered reduced severance benefits in exchange for releases to resolve the dispute over the meaning of the Atmel Plan and Plaintiffs' entitlement to benefits under it.  Taken to its logical extreme, Plaintiffs' argument would preclude parties from settling cases whenever the parties disagreed about the meaning of an ERISA plan.  Plaintiffs have not offered any authority or policy rationale for such a sweeping prohibition, and the Court finds no basis to conclude that a knowing and voluntary release is nonetheless unenforceable in this context.  The Court therefore finds it appropriate to evaluate the totality of the circumstances to determine whether the releases were in fact knowing and voluntary.[4]

To the extent Plaintiffs engage at all with the question of whether the releases were knowing and voluntary, they simply urge that Defendants erroneously determined, and declared to employees, that the Atmel Plan had expired.  Plaintiffs suggest that Defendants were obligated to pay benefits under the plain language of the Atmel Plan.  *See* Dkt. No. 176 at 15, 19–20 (noting that Defendants "refused to pay the full benefits due under ERISA").  Although the Court initially

---

[4] Both in their opposition and during the hearing, Plaintiffs suggest that the Court has already decided that it has the power to prevent Defendants from enforcing the releases.  *See, e.g.*, Dkt. No. 176 at 1.  But until now the Court has not had occasion to consider the merits of Defendants' argument that the releases simply bar Plaintiffs' claims entirely.  The Court further notes that its orders on the motions to dismiss and motions for class certification both predated the Ninth Circuit's memorandum disposition in *Berman*.

1    agreed with Plaintiffs that Defendants' interpretation of the Plan was unreasonable on its face, *see*

2    *Berman*, Dkt. No. 95 at 9–13, the Ninth Circuit disagreed.

3           The Ninth Circuit concluded that "the relevant language in the Atmel Plan is ambiguous."

4    *Berman*, 838 F. App'x at 293.  Specifically, the Court considered the requirement that benefits

5    "will become available to eligible employees only if the Company enters into a definitive

6    agreement [ ], on or before November 1, 2015, *that will result in a Change of Control of the*

7    *Company*."  *Berman*, Dkt. No. 157 at 4115 (emphasis added).  The Ninth Circuit explained that

8    "the phrase 'that will result' is ambiguous because it does not 'exclud[e] all alternative readings as

9    unreasonable,' and the ambiguity is not eliminated by reading the phrase in the context of the plan

10   as a whole."  *Berman*, 838 F. App'x at, 293 (quoting *McDaniel v. Chevron Corp.*, 203 F.3d 1099,

11   1110 (9th Cir. 2000)).  In short, the Ninth Circuit found that the Atmel Plan was susceptible to

12   more than one interpretation.  The actual meaning of the Atmel Plan is of course the crux of the

13   parties' dispute in *Berman* and in this case.  *See, e.g.*, Section III.B.i.

14          But apart from of the actual meaning of the Atmel Plan, the record indicates that Plaintiffs

15   knew there was a dispute about the expiration of the Plan and knew that Defendants explicitly

16   offered the releases (and reduced severance benefits) to resolve this dispute:

17

18          •   During the all-hands meeting for Atmel employees, Microchip and the new Atmel

19              CEO Mr. Sanghi explained that Microchip believed the Atmel Plan had expired,

20              and it would not honor its terms.  *See* Dkt. No. 176-1, Ex. E at 65:24–77:20.  He

21              also used a PowerPoint presentation during the meeting to explain Microchip's

22              interpretation of the Plan and their intention to offer reduced benefits.  *Id.*  The

23              slides stated that "[e]mployees will have to sign and accept the new severance plan

24              and waive any rights under the old plan."  *See* Dkt. No. 163-1, Ex. Q to Ex. 1 at

25              3239.

26

27          •   The offer letters accompanying the releases stated that "Atmel and Microchip are

28              making this offer, in part to resolve any current disagreement or misunderstanding

United States District Court
Northern District of California

regarding severance benefits previously offered by [Atmel], and in part to provide you with the security of certain benefits in the event your relationship is terminated involuntarily without Cause . . . ."  *See* Dkt. No. 163-1, Ex. R to Ex. 1 at 815–20. The letter further explained that the "receipt of the Severance Benefits [under this offer] will be subject to you signing and not revoking a release of any and all claims . . . ."  *Id.*

- Plaintiffs Schuman and Coplin similarly testified during their depositions that they understood they were waiving claims under the Atmel Plan by signing the release. *See* Dkt. No. 163-1, Ex. W to Ex. 1 at 99:19–100:7; *id.*, Ex. S at 88:19–25.  Mr. Schuman said that at the time he signed, he felt like he "was being taken advantage" of, but he "was trying to get this behind [him]" and was "walking away."  *Id.*, Ex. W at 100:19–23.

Plaintiffs offer no contrary evidence regarding their awareness of the dispute and the nature of the releases.  And as the *Berman* case illustrates, not all Atmel employees signed these releases. Some decided not to sign and to pursue their right to benefits under the Atmel Plan instead.

Turning to the other circumstances regarding the releases, Plaintiffs do not challenge Defendants' proffered evidence that the releases were knowing and voluntary under the "heightened scrutiny" six-factor test.  Nor do Plaintiffs offer any evidence of their own that raises a genuine dispute of material fact about these factors.  *See* Dkt. No. 175 at 15 (arguing that "the releases should not be enforceable, whether or not they were 'knowingly' or 'voluntarily' obtained—and regardless of the extent to which plaintiffs were 'intimidated and coerced . . . .'"). The evidence, at least as to Plaintiffs Schuman and Coplin, indicates that the releases were in fact knowingly and voluntarily entered into:

- Defendants point out that both Schuman and Coplin were sophisticated individuals, holding management positions at Atmel.  Plaintiff Coplin was a Director of Human

1   Resources, and was responsible for understanding benefits programs, assisting

2   employees as they needed help, and interfacing with in-house attorneys with any

3   legal issues that arose.  *See* Dkt. No. 163-1, Ex. S. to Ex. 1 at 11:2–12:25, 23:9–25.

4   He also was trained regarding ERISA, attending multiple seminars on the subject.

5   *Id.*  Plaintiff Schuman, in turn, was a Senior Director of Investor Relations.  *See*

6   Dkt. No. 163-1, Ex. JJ to Ex. 1.

7

8   •   As already discussed above, the record indicates that Defendants were clear both in

9       the offer letters themselves and in the all-hands PowerPoint presentation that the

10      releases and payments were offered to resolve any dispute about the meaning of the

11      Atmel Plan and employees' entitlement to benefits under that Plan.  And both

12      Plaintiffs Schuman and Coplin testified during their depositions that they

13      understood they were waiving claims under the Atmel Plan by signing the releases.

14

15  •   The record also indicates that Plaintiffs were given sufficient time to consider the

16      offer.  Plaintiff Schuman acknowledged that he had 45 days to consider whether to

17      accept the offer.  *See* Dkt. No. 108-1, Ex. 6 at 101:3–10; *see also* Dkt. No. 163-1,

18      Ex. W to Ex. 1 at 84:8–13.  During that time, he consulted with a lawyer, but

19      ultimately decided to sign after just a couple weeks "to be done with this" and

20      "walk[] away."  *See* Dkt. No. 163-1, Ex. W to Ex. 1 at 84:12–21, 100:5–7, 100:19–

21      23.  Plaintiff Coplin similarly acknowledged that he had "ample time" to review the

22      offer and release, though he ultimately took just a few days to do so.  *See* Dkt. No.

23      163-1, Ex. S to Ex. 1 at 73:2–4.  The offer itself advised employees to consult with

24      lawyers.  *See id.* at 78:3–25.  However, Plaintiff Coplin explained that he did not

25      consult with a lawyer or other ERISA expert before signing because he thought

26      things were "clear" since "Mr. Sanghi had told [them] what was going on and [the

27      offer] was the end result of what he had planned," and there was no need to consult

28      outside help.  *See id.* at 73:5–74:5.

- In exchange for accepting the offer and signing the release, Plaintiff Schuman received 25% of his annual base salary, or $53,045.00, an incentive bonus of $5,917.81, 100% vesting acceleration of stock, and three months of COBRA benefits paid by Microchip.  *See* Dkt. No. 163-1, Ex. EE to Ex. 1.  Plaintiff Coplin, in turn, received 25% of his annual base salary, or $48,255.99, an incentive bonus of $7,745.90, 100% vesting acceleration of stock, and three months of COBRA benefits paid by Microchip.  *See* Dkt. No. 163-1, Ex. DD to Ex. 1.  As the Court previously explained, they did not offer to tender as part of this lawsuit, and they appear to have retained this consideration.  *See* Dkt. No. 54 at 23–24.

During the hearing on the motion for summary judgment, Plaintiffs suggested for the first time that the release was not sufficiently clear because it did not explicitly reference ERISA claims, although it mentioned statutory provisions generally.  The Court does not ordinarily consider arguments raised for the first time at the hearing.  But even if the Court were to consider this argument, as noted above, Plaintiffs Schuman and Coplin testified that they knew that the releases were intended to resolve the outstanding dispute about their right to ERISA benefits under the Atmel Plan.  *See* Dkt. No. 163-1, Ex. W to Ex. 1 at 99:19–100:7; *id.*, Ex. S at 88:19–25.  Mr. Sanghi explained during the all-hands meeting that "[e]mployees will have to sign and accept the new severance plan and waive any rights under the old plan."  *See* Dkt. No. 163-1, Ex. Q to Ex. 1 at 3239.  And the offer letters themselves explained that "Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by [Atmel] . . . ."  *See* Dkt. No. 163-1, Ex. R to Ex. 1 at 815–20.

Having considered the totality of the circumstances based on the undisputed facts, the Court finds that the releases signed by Plaintiffs Peter Schuman and William Coplin were obtained knowingly and voluntarily.  As a consequence, it is not clear to the Court how this class action can proceed without the two named Plaintiffs.  And it does not appear that any of the other class members would be meaningfully different from Messrs. Schuman or Coplin for purposes of

17

substituting in as a class representative.  The five individuals who did not sign releases do not appear to be similarly situated to the vast majority of the class, and the other class members all signed releases.

Despite Defendants' urging, however, there is not sufficient evidence for the Court to evaluate the six factors as to the remaining Plaintiffs who signed the releases.  As discussed during the hearing on the motion, the Court's order granting class certification was premised, at least in part, on the idea that questions about the enforceability of the releases could be addressed on a class-wide basis.  The parties' class certification briefs focused on the uniformity (or lack thereof) of the communications that Defendants made to class members, but did not discuss the six-factor test described above.  *See, e.g.*, Dkt. No. 108 at 8–9, 15–20.  It is now apparent, however, that the threshold question regarding enforceability of the releases implicates individualized considerations.  The Court therefore **ORDERS** the parties to **SHOW CAUSE** why the class should or should not be decertified in light of the Court's finding that individualized consideration is required under the six-factor test to determine whether the releases were obtained knowingly and voluntarily.  The Court sets a briefing schedule for the OSC in Section IV below..

\*     \*     \*

The Court **GRANTS** the motion for summary judgment as to the two named Plaintiffs.

### B.     Breach of Fiduciary Duties and Equitable Relief

As to the remaining non-named Plaintiffs, Defendants argue that their breach of fiduciary duty claim fails.  Defendants argue that (1) Plaintiffs lack factual support for their contention that Defendants breached any fiduciary duties, and in any event (2) Plaintiffs are not entitled to any of their requested equitable relief for such a breach.  *See* Dkt. No. 163 at 14–25.

#### i.     Alleged Breach

"To establish an action for equitable relief under ERISA section 502(a)(3) [for breach of fiduciary duty], the defendant must be an ERISA fiduciary acting in its fiduciary capacity, and must 'violate [ ] ERISA-imposed fiduciary obligations.'"  *See Mathews v. Chevron Corp.*, 362 F.3d 1172, 1178 (9th Cir. 2004) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996)).  Under ERISA, fiduciaries must "discharge [their] duties with respect to a plan solely in the interest of the

United States District Court
Northern District of California

United States District Court
Northern District of California

participants and beneficiaries" and as relevant here, "for the exclusive purpose of providing benefits to participants and their beneficiaries . . . ." 29 U.S.C. § 1104(a)(1)(A)(i).  ERISA fiduciaries have "an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information." *King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 744 (9th Cir. 2017) (quotation omitted).  And ERISA "fiduciaries breach their duties if they mislead plan participants or misrepresent the terms of administration of a plan." *Id.* (quotation omitted).

Here, Plaintiffs contend that Defendants breached their fiduciary duties by failing to provide complete information about the benefits to which Plaintiffs were entitled, failing to investigate the intended meaning of the Atmel Plan, and offering Plaintiffs reduced severance benefits in exchange for releases.  *See* FAC at ¶¶ 87–89; *see also* Dkt. No. 176 at 2–3, 18–22.  At bottom, these allegations collapse into the same core claim:  Defendants knew or should have known that the Atmel Plan had not in fact expired.

In support of this theory, Plaintiffs point out that in early April 2016, Lauren Carr, Microchip's Senior Vice President of Global Human Resources, saw a letter written to Plaintiff Schuman from Atmel's Senior Vice President of Global Human Resources, which stated in relevant part:

> We recognize that there continues to be significant speculation regarding the acquisition of the company and understand that this can be distracting and unsettling.  As a result we believe it is important to remind you of the benefits for which you may be eligible in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, *including an acquisition by Dialog or Microchip*.

*See* Dkt. No. 176-1, Ex. 6 at 33:10–35:10; *see also id.*, Ex. 2 to Ex. 6 (emphasis added).  The letter further stated that the Atmel Plan "remain[ed] in place." *Id.*  Critically, the letter was dated January 14, 2016, over two months *after* the November 1, 2015, date on which Defendants contend the Atmel Plan expired.  *Id.*  Despite this letter, however, Ms. Carr testified that she thought the language of the Plan was clear that it had expired, and there was no reason to discuss an alternate interpretation with the Plan's drafters.  *See id.*, Ex. 6 at 28:23–33:9.  Similarly, and as

already discussed, Mr. Sanghi testified that he met with Atmel employees after the merger, and understood they were upset by—and disagreed with—Microchip's interpretation that the Plan had expired.  *See* Dkt. No. 176-1, Ex. E at 65:25–71:1, 73:14–77:20.

Defendants argue that irrespective of this evidence, they did not breach any fiduciary duty when they interpreted the Plan as having expired.  Dkt. No. 163 at 15–16; Dkt. No. 177 at 6–8. They point out that the Ninth Circuit concluded that the Plan itself was ambiguous, and characterize that court's decision as finding that their interpretation was reasonable.  *Id.*  As already explained, the Ninth Circuit in *Berman* concluded that summary judgment should not have been entered in the *Berman* plaintiffs' favor because the Atmel Plan was ambiguous on its face. *See Berman*, 838 F. App'x at 293.  The Ninth Circuit quoted this Court's motion to dismiss order in concluding that "reasonable parties could disagree as to whether the [Atmel] Plan required the Initial Triggering Event and the Change of Control to involve the same merger partner."  *Id.* (quoting *Berman*, Dkt. No. 35 at 23).  The Court believes that a somewhat detailed discussion of the circumstances that led to its motion to dismiss order and the Ninth Circuit's memorandum disposition in *Berman* is necessary to provide important clarification.

In their initial motion to dismiss in *Berman*, Defendants argued that Plaintiffs had not sufficiently stated a claim for equitable estoppel.  *See Berman*, Dkt. No. 9 at 17.  Defendants pointed out that Plaintiffs' theory of the case "rest[ed] on the argument that the 'plain language' of the Atmel Plan unambiguously entitle[d] them to benefits . . . ."  *Id.*  Defendants urged that because a claim for equitable relief requires Plaintiffs to show that provisions of the Plan were ambiguous, "any claim for equitable estoppel would directly refute—and destroy—their entire case."  *Id.*  In response to this argument, the Court simply concluded that at the motion to dismiss stage, Plaintiffs could plead in the alternative.  *See Berman*, Dkt. No. 35 at 23, & n.14.  The Court further explained that Plaintiffs had sufficiently pleaded this alternative claim when viewing the fact in the light most favorable to them, as required at the motion to dismiss stage:

> Viewing the facts in Plaintiffs' favor, the Court finds that Plaintiffs have sufficiently pled their claim for equitable estoppel.  First, the Court is satisfied, notwithstanding Plaintiffs' assertions that the provisions of the Atmel Plan are unambiguous, that reasonable parties

> could disagree as to whether the Plan required the Initial Triggering Event and the Change of Control to involve the same merger partner—particularly at the motion to dismiss stage, and particularly since that interpretation is one of the primary disputes in this case.

*Id.* The Court did not make any factual findings about the interpretation of the Plan. *See id.* The Court simply concluded that under the relevant legal standard for a motion to dismiss, a reasonable factfinder could conclude that the Plan was ambiguous and required the same merger partner for both the Initial Triggering Event and the Change of Control. *Id.*

In citing to this Court's language on appeal, the Ninth Circuit did not definitively resolve the meaning of the Plan either. It concluded that "the relevant language in the Atmel Plan [wa]s ambiguous," meaning that summary judgment could not be granted in Plaintiffs' favor based solely on the face of the Plan. *See Berman*, 838 F. App'x at 293. Despite Defendants' urging, the Ninth Circuit did not hold that any claim, including a breach of fiduciary duty claim, somehow fails as a matter of law if it is premised on the misinterpretation of an ambiguous plan. *Id.* Nor did it make any factual findings about the Plan itself. Rather, it found that discovery was appropriate under the circumstances. *Id.* The *Berman* memorandum disposition, therefore, does not definitively resolve this case or even this particular claim.

Still, Defendants repeatedly state that a "reasonable interpretation of an ambiguous plan [ ] cannot constitute a breach of fiduciary duty." *See, e.g.*, Dkt. No. 163 at 15. But they offer no legal support for this conclusion. The Ninth Circuit, on the other hand, has explained that ERISA fiduciaries may misinform beneficiaries and violate their fiduciary duties, not only through direct misstatements, but also "by saying that something is true when the person does not know whether it is true or not." *Mathews*, 362 F.3d at 1183 (quotation omitted) (emphasis omitted); *see also* 29 U.S.C. § 1104(a)(1)(A)(i) (requiring that fiduciaries "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries"). Even if the Plan on its face may have been ambiguous, Plaintiffs allege that Defendants' interpretation was wrong, and that they should have known it was wrong based on the information available to Defendants after the merger. The Court need not, and cannot, decide at this stage the veracity of Defendants' interpretation that the Plan expired, or assess the strength of Plaintiffs' evidence that Defendants knew or should have

21

1    known the actual meaning of the Plan.  But Plaintiffs have raised at least one material dispute of

2    fact regarding Defendants' knowledge of the Plan and its intended interpretation that precludes

3    summary judgment.  The Court therefore **DENIES** the motion on this basis.

ii.    **Equitable Relief**

4

5        "ERISA authorizes participants and beneficiaries to seek equitable relief for violations of

6    [fiduciary] duty."  *Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1051 (9th Cir. 2020)

7    (citing 29 U.S.C. § 1132(a)(3)); 29 U.S.C. § 1132(a)(3)(B) (permitting beneficiary to bring civil

8    action "to obtain other appropriate equitable relief . . . to redress [ERISA] violations").  But

9    without regard to any factual disputes regarding liability for a breach of fiduciary duty, Defendants

10   argue that Plaintiffs are not entitled to any of the equitable relief they seek under § 502(a)(3).  *See*

11   Dkt. No. 163 at 15–25.  Since they initially filed this case, Plaintiffs have winnowed down their

12   requested equitable relief.  They acknowledge that the only equitable relief they are now seeking is

13   an injunction to preclude the enforcement of the releases.[5]  *See* Dkt. No. 176 at 3, 25 ("[T]he

14   appropriate equitable remedy—the *only* remedy that would restore the plaintiffs and class

15   members to their pre-breach status and make them whole from the consequences of those breaches

16   of fiduciary duty—is an order enjoining the enforcement of Microchip's wrongfully obtained

17   releases, thus entitling plaintiffs and class to their long-unpaid severance amounts under the

18   Plan.").

19        Defendants argue that Plaintiffs' claim for injunctive relief fails because the Ninth Circuit

20   previously ruled that the *Berman* plaintiffs' remaining claims for injunctive relief should have

21   been dismissed.  *See* Dkt. No. 163 at 23–24; *see also Berman*, 838 Fed. App'x at 293.

22   Defendants' primary argument that Plaintiffs' injunctive relief is precluded by res judicata is not

23   well taken.  The Ninth Circuit's memorandum disposition does not discuss this issue at any length,

24   but states in the penultimate sentence that "[t]he district court erred in denying the defendants'

25   motion to dismiss . . . the claim for injunctive relief because plaintiffs failed to plead 'irreparable

26   injury.'"  *Berman*, 838 Fed. App'x at 293 (citation omitted).

27

28   ───────────────
[5] Plaintiffs acknowledge that they are no longer seeking equitable estoppel or equitable surcharge.
*See* Dkt. No. 176 at 1, 19, & n.1; *see also* Dkt. No. 144 at 19, n.5.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Critically, Defendants made no effort in their motion to establish that privity exists

2    between the *Berman* plaintiffs and Plaintiffs in this case.  *See Ruiz v. Snohomish Cty. Pub. Util.*

3    *Dist. No. 1*, 824 F.3d 1161, 1164 (9th Cir. 2016) (citing requirements for res judicata to apply,

4    including identity or privity between parties).  Defendants simply asserted in a single sentence that

5    "privity exists between the *Schuman* plaintiffs and the *Berman* plaintiffs," without any

6    explanation.  *See* Dkt. No. 163 at 24.  Only in their reply brief did Defendants attempt to explain

7    how they are in privity, urging in summary fashion that the *Berman* plaintiffs raised similar

8    arguments based on the same underlying factual allegations and were represented by the same

9    attorneys.  *See* Dkt. No. 177 at 14.  Defendants' attempt to support their argument only in reply is

10   improper.  But regardless, their contentions fall short of establishing that a finding of privity is

11   appropriate here.

12   "[P]rivity may exist if there is substantial identity between parties, that is, when there is

13   sufficient commonality of interest."  *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan.*

14   *Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003) (quotation omitted).  Yet Defendants have not

15   adequately explained how the *Berman* plaintiffs had a sufficient commonality of interest to

16   Plaintiffs in this case to warrant a finding of res judicata.  As discussed at length above, unlike in

17   *Berman*, the vast majority of Plaintiffs in this case signed releases and obtained reduced severance

18   benefits upon their termination from Microchip.  Although the complaint in *Berman* references

19   such releases, *see Berman*, Dkt. No. 1 at ¶¶ 53–60, 79, 83–84, Prayer for Relief at ¶ 6, none of the

20   *Berman* plaintiffs signed them.  *Cf. Berman*, Dkt. No. 9 ("[T]he Separation Agreement[s] have no

21   relevancy to Plaintiffs' claims as they admit that *none* of them signed one.") (emphasis in

22   original).  It is therefore unsurprising that in their briefs to the Ninth Circuit the *Berman* parties

23   did not address whether injunctive relief to prevent the enforcement of such releases was

24   appropriate or properly pled.  *See generally* Dkt. No. 179.  The Court therefore  finds that res

25   judicata does not bar Plaintiffs' requested injunctive relief in this case.

26   Nevertheless, given the current posture of this case, the Court need not evaluate whether

27   such relief is actually available or sufficiently supported.  This requested relief—preventing the

28   enforcement of the releases—would be irrelevant to any Plaintiffs whose claims are able to

United States District Court
Northern District of California

proceed in this case.  As to the five Plaintiffs who never signed a release, Defendants could not—and do not seek—to enforce the releases against them.  As to the other non-named Plaintiffs who did sign releases, they will have to establish that the releases were not obtained knowingly and voluntarily in order to proceed with their claims.  If they are able to do so, the releases would be unenforceable anyway.  Following the briefing on class decertification, if any non-named Plaintiffs who signed releases still seek injunctive relief to prevent the enforcement of releases, Defendants may raise this argument again.  For now, the Court **DENIES** the motion on this basis.

   **C.    Denial of Claim Benefits**

   Lastly, in a footnote to their motion, Defendants preserve their argument for appeal that summary judgment is appropriate as to Plaintiffs' Section 502(a)(1)(B) claim for benefits.  *See* Dkt. No. 163 at 7, n.1.  Defendants acknowledge that the Court rejected these same arguments in the *Berman* action, finding that material disputes of fact precluded summary judgment.  *Id.*  The Court continues to find this reasoning correct.  *See Berman*, Dkt. No. 177.  The Court therefore **DENIES** the motion on this basis.

**IV.    CONCLUSION**

   Accordingly, the Court **GRANTS** the motion for summary judgment as to the two named Plaintiffs, but otherwise **DENIES** the motion.  As explained in Section III.A.ii above, the Court further **ORDERS** the parties to **SHOW CAUSE** why the class should or should not be decertified based on the individualized inquiry necessary to assess the validity of the releases signed by the majority of class members.  The parties shall submit simultaneous briefs of no more than 15 pages by September 15, 2023.  The parties may then file simultaneous reply briefs of no more than 10 pages by September 29, 2023.  The matter will be deemed submitted upon receipt of the replies unless otherwise ordered by the Court.

   **IT IS SO ORDERED.**

Dated:   8/23/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge